734 F.2d 108
 UNITED STATES of America, Appellant,
v.
Michael Roland ROY, a/k/a "James Allan Robinson," a/k/a
"James W. Sheriden," a/k/a "Michael Bouchard,"
Defendant-Appellee.
 No. 655, Docket 83-1348.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 27, 1984.
Decided May 3, 1984.
 
 Jeremiah F. Donovan, Asst. U.S. Atty., D. Connecticut, New Haven, Conn. (Alan H. Nevas, U.S. Atty., D. Conn., New Haven, Conn., of counsel), for appellant.
 Richard A. Reeve, Asst. Federal Public Defender, D. Connecticut, New Haven, Conn. (Thomas G. Dennis, Federal Public Defender, D. Connecticut, New Haven, Conn., of counsel), for defendant-appellee.
 Before FRIENDLY, MESKILL and PRATT, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 Pursuant to 18 U.S.C. Sec. 3731 (1982), the government appeals an order of the United States District Court for the District of Connecticut, Zampano, J., suppressing two sawed off shotguns, a handgun, a police scanner, two CB radios, several burglars' tools and various other items found in the trunk and passenger compartment of an automobile operated by appellee Michael Roland Roy. United States v. Roy, 568 F.Supp. 1127 (D.Conn.1983).
 
 
 2
 Roy was charged with two counts of unlawful possession of an unregistered shotgun in violation of 26 U.S.C. Secs. 5861, 5871 (1982) and one count of unlawful possession of a shotgun and a pistol by a convicted felon in violation of 18 U.S.C. App. Sec. 1202 (1982).
 
 
 3
 We vacate the order of suppression and remand the case for further proceedings.
 
 BACKGROUND[1]
 
 4
 Rocky Hill, Connecticut detectives Mazzamurro and Dodenhoff were engaged in a routine patrol in an unmarked car on the evening of December 3, 1982. At approximately 8:00 p.m. the officers drove into the parking lot of the Great Meadow Plaza, a local shopping center. The plaza had been the scene of a number of recent automobile thefts, purse snatchings and robberies. Despite the late hour, most of the stores in the plaza were open because of the holiday season.
 
 
 5
 The officers parked their car and began a surveillance of the area. They observed a "beat up" Subaru automobile with Massachusetts license plates backed into a parking space at the south end of the lot, giving the two male occupants an unobstructed view of the stores. Both men wore hats over their foreheads, sat in a slouched position and stared at the stores in front of them. The men did not appear to be talking to each other. Neither officer recognized the men or the vehicle.
 
 
 6
 Based on their "experience and expertise," the officers surmised that a robbery was about to occur. Officer Mazzamurro radioed for a patrol car to render assistance. Almost immediately, the occupant of the front passenger seat of the Subaru, Martinez, left the car and walked toward the stores, looking over his shoulder in a nervous fashion as he walked away from the car. The driver of the automobile, Roy, then drove the car out the main entrance of the plaza and turned left onto a local thoroughfare. Officer Mazzamurro radioed the patrol car to apprehend Martinez and then followed the Subaru out of the parking lot.
 
 
 7
 Roy drove a short distance, stopped at a stop sign and made a right turn. The officers pulled alongside the Subaru, flashed their badges and ordered Roy to stop. He complied. The officers got out of their car and approached the Subaru. Their guns were not drawn. They asked Roy for identification. As he removed a license from his wallet, the officers heard a police radio transmission coming from the interior of the Subaru. When Officer Mazzamurro asked Roy about the source of the transmission, Roy started to reach down between his legs. Concerned for their safety, the officers forcibly removed Roy from the car and arrested him for attempted robbery. Officer Mazzamurro reached under the seat and found a police scanner. A subsequent examination revealed that the brand name and serial number of the scanner had been pried off.
 
 
 8
 Following the arrest, the officers searched the interior of the car. They seized a hat, a ski mask and a pair of binoculars. One of the officers called for a wrecker to tow the car away. When they asked Roy for permission to open the trunk, he refused. One of the officers reached into the car, removed the ignition key and opened the trunk. They seized from the trunk, inter alia, two sawed off shotguns, a pistol with the serial number removed, a box of shotgun ammunition, a pry bar, two hacksaw blades, a dent puller, a hydraulic jack, a glass cutter, two CB radios, several pairs of rubber gloves and a ski mask. Several of the items were found inside bags or pouches.
 
 
 9
 Roy was taken to police headquarters and booked under the name "James Allan Robinson," the name on an Oklahoma driver's license which he carried. Fingerprint analysis revealed that he was not Robinson but Roy. It was subsequently learned that Roy was an escaped felon. He had pleaded guilty to armed robbery and escape in Du Page County, Illinois in 1982 and was sentenced to concurrent prison terms of fifteen and five years, respectively. After his conviction and sentencing, Roy was transferred to the federal Metropolitan Correctional Center (MCC) in Chicago to answer federal bank robbery charges in Florida. Roy escaped from the MCC in October 1982 and remained at large until his apprehension in Connecticut on December 3, 1982.[2]
 
 DISCUSSION
 
 10
 On appeal, the government claims that the district court erred in holding that the initial stop of Roy's car and the subsequent search and seizure were unreasonable and thus violated the Fourth Amendment. It seeks on this basis to vacate the order suppressing the weapons and the other items seized from the car. The threshold question is whether Roy, as an escaped felon, had a legitimate expectation of privacy in the automobile that was violated by the search which occurred. We conclude that Roy had no legitimate expectation of privacy in the passenger compartment or trunk of the Subaru. Therefore, he cannot successfully challenge the police conduct here. Because the district court erred in suppressing the items seized, we vacate the suppression order and remand the case for further proceedings.
 
 
 11
 A defendant cannot invoke the Fourth Amendment's protections unless he has a legitimate expectation of privacy against the government's intrusion. United States v. Jacobsen, --- U.S. ----, ----, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); Illinois v. Andreas, --- U.S. ----, ---- - ----, 103 S.Ct. 3319, 3322-24, 77 L.Ed.2d 1003 (1983); United States v. Knotts, --- U.S. ----, ----, 103 S.Ct. 1081, 1084, 75 L.Ed.2d 55 (1983); Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (citations omitted). The Supreme Court has on several occasions endorsed the two point test formulated by Justice Harlan in Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), to determine if a defendant has a legitimate expectation of privacy. See, e.g., Michigan v. Clifford, --- U.S. ----, ----, 104 S.Ct. 641, 646, 78 L.Ed.2d 477 (1984) (plurality opinion); United States v. Knotts, --- U.S. at ----, 103 S.Ct. at 1084; Smith v. Maryland, 442 U.S. at 740-41, 99 S.Ct. at 2580-81; Rakas v. Illinois, 439 U.S. 128, 143-44 n. 12, 99 S.Ct. 421, 430-31 n. 12, 58 L.Ed.2d 387 (1978). Justice Harlan's test to ascertain whether a legitimate expectation of privacy existed is:
 
 
 12
 [F]irst that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable."
 
 
 13
 Katz v. United States, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).
 
 
 14
 We have little doubt that Roy harbored a subjective expectation of privacy, at least as to the trunk of the Subaru. His locking the weapons and several other items in the trunk of the car indicates as much. See United States v. Ross, 456 U.S. 798, 823, 102 S.Ct. 2157, 2171, 72 L.Ed.2d 572 (1982).
 
 
 15
 Therefore, Roy satisfies the first part of Justice Harlan's test. However, Roy fails to satisfy the second part of the test; his expectation of privacy in the automobile is not one that society is prepared to recognize as legitimate. In Rakas v. Illinois, the Supreme Court, citing Jones v. United States, 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960), explicitly noted that society did not recognize as reasonable the privacy rights of a defendant whose presence at the scene of the search was "wrongful." 439 U.S. at 141 n. 9, 99 S.Ct. at 429 n. 9. The Court noted two examples of persons who did not have legitimate expectations of privacy due to wrongful presence: a person present in a stolen automobile at the time of the search, id., and "[a] burglar plying his trade in a summer cabin during the off season." Id. at 143-44 n. 12, 99 S.Ct. at 430-31 n. 12.
 
 
 16
 Roy's presence in Rocky Hill on December 3 was also wrongful, since he was an escapee from the MCC in Chicago. See 18 U.S.C. Sec. 751 (1982) (inmate who escapes from federal custody commits a criminal act). At the time of the search and seizure, Roy was no more than a trespasser on society. Cf. State v. Hiott, 276 S.C. 72, 77, 276 S.E.2d 163 (1981) ("As prison escapees, defendants obviously were not legitimately on the premises.").[3] His position is not unlike that of the Supreme Court's hypothetical burglar or occupant of a stolen car.
 
 
 17
 This is not to say that Roy's escape deprived him of all expectations of privacy. We consider an escapee to be in constructive custody for the purpose of determining his legitimate expectations of privacy; he should have the same privacy expectations in property in his possession inside and outside the prison. See Robinson v. State, 312 So.2d 15, 18 (Miss.1975) ("appellant's Fourth Amendment rights were no greater as an escapee than they were while he was in the confines of the penitentiary").
 
 
 18
 Roy's legitimate privacy expectations were severely curtailed while he was incarcerated. See, e.g., Bell v. Wolfish, 441 U.S. 520, 556-57, 99 S.Ct. 1861, 1883, 60 L.Ed.2d 447 (1979); Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 2974-75, 41 L.Ed.2d 935 (1974); Lanza v. New York, 370 U.S. 139, 143-44, 82 S.Ct. 1218, 1220-21, 8 L.Ed.2d 384 (1962); Stroud v. United States, 251 U.S. 15, 21-22, 40 S.Ct. 50, 52-53, 64 L.Ed. 103 (1919); Hodges v. Stanley, 712 F.2d 34, 35 (2d Cir.1983) (per curiam); Palmer v. Hudson, 697 F.2d 1220, 1223-24 (4th Cir.) (collecting cases), cert. granted, --- U.S. ----, 103 S.Ct. 3535, 77 L.Ed.2d 1386 (1983). Cf. United States v. Thomas, 729 F.2d 120, 123 (2d Cir.1984) (parolee who has been legitimately released from the physical confines of prison retains only a limited legitimate expectation of privacy). There is no question that Roy would not have had a legitimate expectation of privacy in a motor vehicle operated on prison grounds. See Bell v. Wolfish, 441 U.S. at 555-57, 99 S.Ct. at 1882-83 (unannounced search of prison cell does not violate Fourth Amendment); Palmer v. Hudson, 697 F.2d at 1224 ("Because of the legitimate demands of prison security, and to a lesser extent a prisoner's diminished expectation of privacy, neither a warrant nor probable cause is a prerequisite to a search or seizure in prison.... Irregular, unannounced shakedown searches of prison property are permissible, for they are an effective means of ensuring that prisoners do not possess contraband.") (citations and footnote omitted). Roy could have been stopped, the interior of the car searched and the trunk opened without probable cause if the search occurred within prison walls. Therefore, because Roy would not have a legitimate expectation of privacy against the government's intrusion while incarcerated, we should not recognize such an expectation of privacy after he escapes.
 
 
 19
 Roy argues that his limited expectation of privacy while in prison is based solely on the nature of incarceration and the need to maintain security. See, e.g., Bell v. Wolfish, 441 U.S. at 559, 99 S.Ct. at 1884; Wolff v. McDonnell, 418 U.S. at 555, 94 S.Ct. at 2974. Assuming this to be true, a proposition we do not address, it does not follow that Roy could expand his legitimate expectations of privacy by escaping.[4] A contrary determination would offer judicial encouragement to the act of escape and would reward an escapee for his illegal conduct. Moreover, the rationale for granting an incarcerated individual a limited expectation of privacy, i.e., the prison community's need for security, does not suggest different treatment for an escapee. While incarcerated, the prison population was protected by the severe limitations on Roy's constitutional rights and the public was protected from Roy by the prison walls. After the escape, the prison walls no longer protected the public from Roy. The public's need for protection from Roy argues against according him any greater Fourth Amendment rights because of his criminal act of escape.[5]
 
 
 20
 Lacking a legitimate expectation of privacy under the circumstances, Roy cannot assert the unreasonableness of the search and seizure under the Fourth Amendment. United States v. Jacobsen, --- U.S. at ----, 104 S.Ct. at 1660; Smith v. Maryland, 442 U.S. at 740, 99 S.Ct. at 2580 (citations omitted). See United States v. Chadwick, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977) (Fourth Amendment protections extend only to "unreasonable government intrusions into ... legitimate expectations of privacy"). Therefore, we vacate the suppression order and remand the case to the district court for further proceedings.
 
 
 21
 FRIENDLY, Circuit Judge, concurring in the result:
 
 
 22
 I am not at all convinced that Roy's Fourth Amendment claims should be dismissed on the ground that, because he had escaped from prison, he had no expectation of privacy "that society is prepared to recognize as 'reasonable'." Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). When Justice Harlan's much-quoted observation is read in context, it becomes apparent that he was speaking of the places where society would be prepared to recognize an individual's reasonable expectation of privacy,[1] not adumbrating a doctrine whereby certain classes of persons could be denied Fourth Amendment protections that would otherwise extend to them. I likewise see no support for the majority's ruling in Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The holding in that case, that passengers in a suspected get-away car which the owner was driving had no standing to object to the search of the car and the seizure of a rifle and shells which they did not own, is manifestly irrelevant. So also are the two footnotes in Rakas on which the majority relies. The first of these, see 439 U.S. at 141 n. 9, 99 S.Ct. at 429 n. 9, is addressed to two situations: One, encompassed by a quotation from Jones v. United States, 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960), is that of the thief apprehended on premises being searched; the other is that of a person present in a stolen automobile. The second, see 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12, the beguiling case of "[a] burglar plying his trade in a summer cabin during the off season", is, as Justice Rehnquist noted, essentially the same as that envisioned in the quotation from Jones. The attempt to bring the case of an escapee within the scope of these footnotes by branding Roy "a trespasser on society" is a novel notion, indeed. I have heard of trespassers on land, trespassers on ships, even, although not recently, of trespassers on the case, but never before of a "trespasser on society." If the metaphor means what it seems to mean it has frightening implications[2] which my brothers would be the first to reject if put to the test.
 
 
 23
 It is true that persons in certain situations do not enjoy the full measure of Fourth Amendment protection. The most notable are the prisoner and the pretrial detainee, see Bell v. Wolfish, 441 U.S. 520, 544-48, 99 S.Ct. 1861, 1877-79, 60 L.Ed.2d 447 (1979). But the restrictions on the Fourth Amendment rights of such persons are only those having a purpose related to their condition of incarceration. As Justice Rehnquist said in Wolfish, supra, 441 U.S. at 546, 99 S.Ct. at 1877, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." I can also agree that effective administration of the parole system may require that a parolee submit to a warrantless inspection of his person on a visit to the parole officer, as a majority held in United States v. Thomas, 729 F.2d 120 (2 Cir.1984). Conceivably, although there is no occasion here to decide the point, the importance of placing an escaped prisoner back behind the walls that protected society from him might justify some lowering of the level of probable cause with respect to identification required to effect his arrest as an escapee. But I see nothing in all this that justifies a withdrawal of Fourth Amendment rights when someone is thought to have been engaged in a crime unrelated to the escape and turns out to be an escaped prisoner. Although the picture of an escapee reembarking on a career of crime is not attractive, society should be equal to apprehending him without violating the guarantees of the Fourth Amendment.
 
 
 24
 The majority's holding that escapees "should have the same privacy expectations in property in [their] possession inside and outside the prison" seems to me to be not only illogical but unworkable. How could a court realistically transpose what occurred in a Connecticut town and on Connecticut roads on a cold December night into the walls of the MCC in Chicago? Although the majority here speaks only of expectations of privacy in property, it is hard to see why its new analysis should not apply to privacy expectations of whatever sort. Would my brothers really approve if the police here had subjected Roy to the search of body cavities sanctioned for inmates after contact visits in Wolfish, supra, 441 U.S. at 558, 99 S.Ct. at 1884? Beyond all this, a rule allowing police officers to engage in conduct that would violate the Fourth Amendment if practiced on citizens generally and then to justify it on the ground, unknown to the police at the time, that the victim was an escapee, scarcely accords with the important values that the Amendment was meant to protect.[3]
 
 
 25
 The majority's new departure is the more regrettable in that the police officers acted with entire propriety and the suppression order must thus be reversed on traditional grounds. As Judge Meskill indicates, ante at 112 n. 4, the discussion by the district judge and in the briefs before us was much confused by focusing on the validity of Roy's arrest, the legality of which is immaterial since it produced nothing in the way of evidence and need not be used to justify the search, rather than on the search and seizure. The analysis with respect to these is simple and straightforward. The facts recited in the first three paragraphs of Judge Meskill's discussion of "Background" afforded ample justification for ordering Roy to stop his car and asking for identification. Also significant was the action taken by Martinez and Roy immediately after Officer Mazzamurro radioed for a police car to render assistance. Although this assumed added importance when the officers heard the police transmission after the stop, the evidence that scanners are readily purchased at consumer electronic stores suggests it was reasonable for the officers' suspicions to be reenforced by what might otherwise have seemed a coincidental departure from the parking lot. Once the legality of the stop is established, Michigan v. Long, --- U.S. ----, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), supports the search of the passenger compartment and the consequent seizure of the scanner, the ski mask and the binoculars. Long holds that a police officer who has made a Terry stop of an automobile may make a protective search of the passenger compartment limited to areas in which a weapon might be placed or concealed, if he has a reasonable belief, based on specific and articulable facts and inferences therefrom, that the suspect is dangerous and may gain immediate control of the weapons. At ----, 103 S.Ct. at 3481, 77 L.Ed.2d at 1220. Here, at least from the time they heard the scanner, the police had a reasonable belief that they were in the presence of a potential bank robber who almost certainly had guns. Such a search is justified notwithstanding that, at the time of investigation, the suspect was under the officers' control. See id. at ---- - ---- & n. 16, 103 S.Ct. at 3481-82 & n. 16, 77 L.Ed.2d at 1221-22 & n. 16.
 
 
 26
 Discovery of the scanner with its plate removed, of the ski mask and the binoculars strongly reinforced the officers' earlier belief that Roy was an armed robber. The question was where the arms were. Since they were not in the passenger compartment, the officers had good reason to think they must be in the trunk. To be sure, Roy and his confederate might have left their arms at home that night, but then why the ski mask and the binoculars? Under these circumstances the officers would have had probable cause to obtain a warrant to search the trunk, and United States v. Ross, 456 U.S. 798, 800, 823, 102 S.Ct. 2157, 2171, 72 L.Ed.2d 572 (1982), holds that officers "may conduct a probing search of compartments and containers within the vehicle whose contents are not in plain view" as thorough as a magistrate could have authorized if the officers had applied for a search warrant.[4] As Ross shows, a "compartment" includes the trunk.
 
 
 27
 The search and seizure were thus entirely proper and the suppression order should be vacated on that ground. I therefore concur in the judgment of reversal but not in the opinion.
 
 
 
 [1]
 The hearing on Roy's motion to suppress was held before Chief Judge Daly on April 4, 1983. On April 14, 1983, prior to a ruling on the motion, Chief Judge Daly transferred the matter to Judge Zampano "in the interest of justice." The parties voiced no objection to the transfer and agreed that Judge Zampano should decide the motion on the basis of the submitted briefs and moving papers, a transcript of the April 4 hearing and various pieces of documentary and physical evidence
 The government now urges us to conduct a de novo review of Judge Zampano's findings of fact because they were made without the benefit of live testimony before the judge. We decline this opportunity. We will not ordinarily disturb the district court's findings of fact unless they are "clearly erroneous." See 8B J. Moore, Moore's Federal Practice p 41.25, at 41-310 (2d ed. 1983). We see no reason to change this practice merely because the findings of fact were made following a hearing before a different judge. Cf. Preliminary Draft of Proposed Amendment to Fed.R.Civ.P. 52(a), 98 F.R.D. 337, 359-61 (1983) ("[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous").
 The findings of fact below were amply supported by the record and thus are not "clearly erroneous." We accept these facts for the purposes of this appeal.
 
 
 [2]
 At the time of Roy's arrest, state warrants were outstanding against him on charges of homicide in California and bank robbery in Massachusetts
 
 
 [3]
 Roy argues that he should not be considered an escaped sentenced prisoner since his Illinois sentence had been stayed while he was awaiting trial in federal custody. We are unpersuaded. Roy would have been incarcerated in state prison had he not been held in federal custody. He was not a free man; his imprisonment was a direct result of his state convictions. Moreover, we see no difference between considering Roy as an escaped convict or an escaped pretrial detainee. In either case, Roy's presence at the scene of the search was wrongful since he was supposed to be incarcerated and would have been but for his illegal escape
 
 
 [4]
 The focus here is not on the legality of the arrest but rather on the propriety of the search and seizure. There is no reason to determine if sufficient grounds existed to seize Roy since that would be an inquiry irrelevant to the consideration of Roy's reasonable expectations of privacy in the automobile
 
 
 [5]
 This is especially true for a dangerous person like Roy, who was convicted of armed robbery. Unlike the pretrial detainee, Roy lost his presumption of innocence when he was convicted and incarcerated. See United States v. Grant, 433 F.Supp. 1113, 1114 (S.D.N.Y.1977)
 
 
 [1]
 Thus, a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable
 389 U.S. at 361, 88 S.Ct. at 516, citing Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), the "open fields" case recently reaffirmed in Oliver v. United States, --- U.S. ----, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).
 
 
 [2]
 One is reminded of Maitland's description of the outlaw in early English law:
 He who breaks the law has gone to war with the community; the community goes to war with him. It is the right and duty of every man to pursue him, to savage his land, to burn his house, to hunt him down like a wild beast and slay him; for a wild beast he is; not merely he is a 'friendless man', he is a wolf.
 
 
 [2]
 Pollock & Maitland, History of English Law 449 (2d ed. 1911)
 
 
 [3]
 There also could hardly be a case where the circularity of the legitimate-expectation-of-privacy test, if carried to an extreme, is more apparent. Until my brothers rendered their opinion, no one would have known that an escapee has no interest in privacy which society is prepared to recognize. If we now know this, it is not because of any articulated expression by society but because the majority have so decided
 
 
 [4]
 Although the majority in Ross frequently referred to probable cause to suspect the presence of "contraband", its final holding was "that the scope of the warrantless search authorized by [the automobile] exception is no broader and no narrower than a magistrate could legitimately warrant", 456 U.S. at 825, 102 S.Ct. at 2172. This language, together with the logic of the opinion, indicates that Ross applies regardless of the nature of the item seized, so long as the seizure could have been authorized by warrant. As Professor LaFave has observed, this, of course, is not limited to contraband. See 2 LaFave, Search & Seizure Sec. 7.2 at 202-03 (Supp.1984)