**UNITED STATES of America, Appellee,**

v.

**Michael Roland ROY,
Defendant-Appellant.**

No. 85–1047.

United States Court of Appeals,
Second Circuit.

Argued June 3, 1985.
Decided Aug. 26, 1985.

Richard A. Reeve, Asst. Fed. Public Defender, New Haven, Conn. (Thomas G. Dennis, Fed. Public Defender, New Haven, Conn., on brief), for defendant-appellant.

Jeremiah F. Donovan, Asst. U.S. Atty., New Haven, Conn. (Alan H. Nevas, U.S. Atty., New Haven, Conn., on brief), for appellee.

Before MESKILL, NEWMAN, and KEARSE, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

The Interstate Agreement on Detainers Act (the "Agreement"), 18 U.S.C. app. pp. 545–48 (1982), provides a mechanism by which a prosecutor in one jurisdiction, the "[r]eceiving [s]tate," *id.* art. II(c), may secure the presence of a prisoner who is serving a sentence in another jurisdiction, the "[s]ending [s]tate," *id.* art. II(b), in order to try him on charges pending in the receiving state, *id.* art. IV(a). Once the receiving state commences criminal proceedings through this mechanism, the Agreement affords the prisoner certain protections. Article IV(c) provides that the prisoner's trial in the receiving state must be commenced within 120 days of his arrival there. Article IV(e) provides that, once the receiving state obtains custody of the prisoner, it must try him prior to returning him to his "original place of imprisonment." In this case, defendant-appellant Michael Roy seeks dismissal of a federal indictment charging him with three counts of unlawful possession of firearms on the ground that, in proceeding against him on those charges, the Government violated his rights under articles IV(c) and IV(e) of the Agreement. The District Court for the District of Connecticut (Robert C. Zampano, Judge) rejected Roy's arguments and, accordingly, denied his motion to dismiss the indictment. *United States v. Roy*, 597 F.Supp. 1210 (D.Conn.1984). Roy subsequently pled guilty reserving for appeal his claims arising under the Agreement.[1] We affirm.

## BACKGROUND

Since the District Court's opinion carefully recounts the chronology of the events leading up to this appeal, 597 F.Supp. at 1212–13, a summary identifying the sequence of critical dates will suffice here. On December 3, 1982, Rocky Hill, Connecticut, police officers arrested Roy on state charges of attempted robbery. A search of Roy's car disclosed two sawed-off shotguns and a pistol, possession of which formed the basis for the federal charges in this case. Following his arrest on the state charges, Roy was incarcerated as a pretrial state prisoner, first in the Hartford Community Correctional Center ("Hartford CCC") and later in the Connecticut Correc-

---

1. The plea agreement also preserved a Fourth Amendment claim, previously decided adversely to Roy on an interlocutory appeal by the Government, *see United States v. Roy*, 734 F.2d 108 (2d Cir.1984), and raised now by Roy only to preserve the issue for a potential petition for a writ of certiorari.

tional Institution at Somers ("Somers CCI" or "Somers"), to which he was transferred on December 16. On January 27, 1983, the State of Connecticut revoked Roy's parole on a prior state conviction, and he resumed serving his state sentence. On February 24, 1983, a federal grand jury indicted Roy on the federal firearms charges. 18 U.S.C. app. § 1202 (1982); 26 U.S.C. §§ 5861, 5871 (1982). The United States Marshal's Service mailed a detainer based on the indictment to Hartford CCC. Officials at Hartford CCC forwarded the detainer to Somers CCI, where it was lodged against Roy on March 3, 1983.[2]

Previously, on February 28, 1983, the Government had obtained a writ of habeas corpus *ad prosequendum* ("writ") and an "order to produce" based on the writ directing that Roy be produced before the District Court in Bridgeport.[3] Roy was initially produced for arraignment on March 2, 1983, and returned to Somers the same day, one day before the detainer was lodged against him. The events giving rise to Roy's claim that the Government violated article IV(e) took place on April 4 and 5, 1983. On April 4, pursuant to another "order to produce" based on the writ, Roy was brought before the District Court for a hearing on his motion to suppress the weapons seized from his car. The hearing ended after 5:00 p.m. The marshals decided not to return Roy to Somers that night because, knowing Roy had escaped from the custody of federal marshals in Illinois, they believed that it would be imprudent to undertake after dark the three-hour jour-

ney from Bridgeport to Somers. The marshals were also concerned that, if Roy was returned to Somers at night, he would be deprived of an evening meal. Accordingly, with the approval of officials at Somers CCI, Roy was lodged overnight at the Bridgeport jail and returned to Somers at 12:30 p.m. on April 5. Roy contends that the Government violated article IV(e) by failing to return him to Somers on April 4.

On August 9, 1983, the District Court granted Roy's motion to suppress, *United States v. Roy*, 568 F.Supp. 1127 (D.Conn. 1983), and the Government appealed. The Connecticut charges pending against Roy were then nolled, but Roy remained incarcerated at Somers CCI pursuant to the state sentence he was serving after his parole was revoked. That sentence expired on February 16, 1984, at which time Roy became a federal pretrial prisoner. On May 3, 1984, we reversed the District Court's order granting the motion to suppress and remanded the case for trial. *United States v. Roy*, 734 F.2d 108 (2d Cir.1984). Roy contends that the Government violated article IV(c) because, in his view, the almost nine months during which the appeal was pending may not be excluded in computing the 120-day time period in which trial must begin.

## Discussion

Initially, we are confronted by the Government's assertion that the Agreement does not apply in this case. Relying on cases holding that the Agreement does

**2.** This detainer was one of several filed against Roy during the time he was incarcerated at Hartford CCC and Somers CCI. On December 8, 1982, a federal detainer based on an escape charge pending in the Northern District of Illinois was lodged at Hartford CCC. On January 28 and 29, 1983, respectively, detainers were filed at Somers by California authorities, based on a murder charge, and by Massachusetts authorities, based on a robbery charge. On June 14, 1983, Roy was transported to California for prosecution on the murder charge. The charge was dismissed on June 22, and Roy was returned to Somers on August 2. On September 12, 1983, a federal detainer was filed against Roy based on a bank robbery indictment pending in the Middle District of Florida. Roy was taken to Florida on

October 24, 1983, and was acquitted on the bank robbery charges on May 27, 1984. Roy was returned to Somers CCI on June 8 and filed the motion to dismiss underlying this appeal on June 15.

**3.** The writ required state officials to turn Roy over to the United States Marshal for his initial arraignment on March 2, 1983, "or from time to time thereafter as the case may be adjourned to." Once a writ has been issued, subsequent court appearances are obtained by means of an "order to produce" issued by the United States Attorney to the United States Marshal. In this case, an order to produce was issued even for the initial appearance.

not protect pretrial detainees, *see, e.g.,* *United States v. Reed,* 620 F.2d 709, 711 (9th Cir.), *cert. denied,* 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980); *United States v. Evans,* 423 F.Supp. 528, 531 (S.D. N.Y.1976), *aff'd mem.,* 556 F.2d 561 (2d Cir.1977), the Government argues that the Agreement does not protect a prisoner who, like Roy, is incarcerated in the sending state, both awaiting trial on charges pending there and serving a sentence for a prior conviction. The Government also argues that, under *United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 349 (1978), the Agreement is not triggered where a prisoner's presence is obtained pursuant to a writ issued prior to the date when a detainer is lodged against him. We agree with the District Court that in light of the purposes of the Agreement neither of these arguments is persuasive.

In *United States v. Ford,* 550 F.2d 732 (2d Cir.1977), *aff'd sub nom. United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), we reviewed the history and purpose of the Agreement, noting particularly the serious hardships an unregulated system of detainers imposed on prisoners. *Id.* at 737–40. A detainer is filed against a prisoner in order to inform the institution where he is incarcerated that he is wanted for trial on charges pending in another jurisdiction. S.Rep. No. 1356, 91st Cong., 2d Sess. 2, *reprinted in* 1970 U.S. Code Cong. & Ad.News 4864, 4865. Prior to adoption of the Agreement, the prisoner frequently would not be prosecuted on those subsequent charges until completion of his current prison term. *United States v. Ford, supra,* 550 F.2d at 737. Even if pending charges were promptly prosecuted, there was virtually no coordination between service of a current sentence and transfers in connection with disposition of those charges, and there was no assurance that a prisoner transferred to another jurisdiction for prosecution would be returned to complete his sentence. These uncertainties made it difficult for the jurisdiction having custody of the prisoner to develop a

"coherent program" for his incarceration and rehabilitation. *Id.* at 739–40. Moreover, the existence of a detainer on a prisoner's record frequently rendered the prisoner ineligible for participation in special programs or even for release on parole. *Id.* at 737–38. These consequences of detainers led to adoption of the Agreement.

The Agreement protects prisoners who are "serving a term of imprisonment," art. IV(a), in a member jurisdiction[4] and who have detainers lodged against them based on charges pending in another member jurisdiction. The Agreement has put in place a set of "cooperative procedures" designed to "encourage the expeditious and orderly disposition" of those pending charges. Art. I. In addition to supplying prosecutors with a set of formal rules by which they can obtain custody of a defendant incarcerated in another state, art. IV, the Agreement affords protection to a prisoner whose custody is secured under those rules, art. IV(c), (e), and provides all prisoners with a means by which to clear their records of detainers, art. III.

The provisions in issue here further the overall purposes of the Agreement. By assuring the prisoner that his trial in the receiving state will be handled expeditiously, the speedy trial provision of article IV(c) reduces the uncertainties created by the pending charges. *See United States v. Chico,* 558 F.2d 1047, 1048 (2d Cir.1977), *cert. denied,* 436 U.S. 947, 98 S.Ct. 2850, 56 L.Ed.2d 788 (1978). By requiring the receiving state to try the prisoner before returning him to the "original place of imprisonment," article IV(e) tries to minimize disruption of the sending state's rehabilitation program. *Id.* at 1049.

■ In light of this background, we reject the Government's argument that the Agreement does not apply in this case. First, we agree with the District Court that there is no merit to the Government's position that the Agreement does not protect Roy because, in addition to serving his prior Connecticut sentence, he was also

---

**4.** Both the United States and the State of Connecticut are member jurisdictions.

awaiting trial on pending Connecticut charges. The cases holding that a pretrial detainee is not "serving a term of imprisonment" within the meaning of the Agreement have reasoned that such detainee lacks a sufficient interest in the rehabilitation programs of the confining jurisdiction to justify invocation of the Agreement. *See, e.g., United States v. Reed, supra,* 620 F.2d at 711. At the time the detainer was lodged against Roy, however, he was serving a sentence imposed on a Connecticut conviction. The fact that additional Connecticut charges were pending against him did not diminish his interests in his rehabilitation and in avoiding the adverse consequences on the conditions of his confinement caused by the filing of a detainer.

Second, we reject the Government's argument that in light of *United States v. Mauro, supra,* the Agreement is inapplicable because Roy was produced in federal court pursuant to a writ of habeas corpus *ad prosequendum.* In *Mauro,* the Supreme Court held that a writ of habeas corpus *ad prosequendum,* though similar to a detainer in that it permits a federal court to compel the presence of a state prisoner for trial on federal criminal charges, does not constitute a detainer for purposes of the Agreement but does constitute a "written request for temporary custody" within the meaning of article IV of the Agreement. In reaching this decision, the Supreme Court carefully reviewed the nature of the writ and the purposes of Congress in adopting the Agreement. The Court concluded that when "the United States obtains state prisoners by means of a writ of habeas corpus *ad prosequendum,* the problems that the Agreement seeks to eliminate do not arise." *United States v. Mauro, supra,* 436 U.S. at 361, 98 S.Ct. at 1847 (footnote omitted). But the Court went on to say that whenever the Government "initiates the disposition of charges underlying a detainer it has previously lodged against a state prisoner," *id.* at 364, 98 S.Ct. at 1849, the speedy trial clock of the Agreement starts running, even though the prisoner is brought into federal court by issuance of a writ, *id.* at 363–64, 98

S.Ct. at 1848–49; *see id.* at 362, 98 S.Ct. at 1848 ("Because the detainer remains lodged against the prisoner until the underlying charges are finally resolved, the Agreement requires that the disposition be speedy and that it be obtained before the prisoner is returned to the sending State."). This result assures the prisoner of prompt disposition of federal charges, thereby reducing the adverse effects on the conditions of his custody that flow from a detainer, notwithstanding the fact that his presence in federal court was procured by a writ. *See id.* at 359–60, 361 n. 26, 98 S.Ct. at 1846–47, 1847 n. 26 ("These problems, of course, would not arise if a detainer had never been lodged and the writ alone had been used to remove the prisoner, for the writ would have run its course and would no longer be operative upon the prisoner's return to state custody.").

The Government reads *Mauro* as establishing a rule that depends on the sequence of the issuance of a writ and the lodging of a detainer; in the Government's view, the Agreement applies only when a writ is issued after a detainer is lodged. Because in this case the writ that authorized Roy's initial and subsequent appearances in the District Court issued prior to the lodging of the detainer, the Government argues that under *Mauro* the Agreement is inapplicable to this case. We agree with the Government that the sequence of events determines whether the Agreement applies, but we conclude that the critical date to be compared to the date the detainer is lodged is not the date the writ issues but the date the prisoner is brought to federal court pursuant to the writ. The rulings with respect to the three prisoners before the Supreme Court in *Mauro* illustrate the point. If, as occurred with Mauro and Fusco, a prisoner is initially brought to federal court pursuant to a writ at a time when no detainer has been lodged, the Agreement does not apply. 436 U.S. at 344, 364 n. 30, 98 S.Ct. at 1839, 1849 n. 30. But once the detainer is lodged, as occurred with Ford, the Agreement is applicable, and court appearances occurring there-

after are governed by the Agreement, whether such appearances are arranged under the authority of the detainer or a writ. *Id.* at 361–62, 98 S.Ct. at 1847–48. The lodging of the detainer precipitates the range of adverse consequences that the Agreement was designed to mitigate, *id.* at 362, 98 S.Ct. at 1848, and the prisoner's right to limit the duration of the detainer and his right to avoid a succession of prolonged confinements away from the place he is serving his current sentence are both entitled to be vindicated at all times after the detainer has been lodged. Once a detainer is lodged the prior issuance of a writ cannot insulate the Government from the requirements of the Agreement during all subsequent demands for production of the prisoner in connection with the prosecution of the federal charges. The Government may, if it wishes, forgo lodging a detainer and conduct the federal prosecution free of the Agreement's provisions. *Id.* at 364 n. 30, 98 S.Ct. at 1849 n. 30.

■ Having decided that the Agreement governs this case, we turn to the question whether it has been violated. Roy first argues that the Government did not bring him to trial within the 120-day period specified in article IV(c) of the Agreement. Specifically, Roy suggests that the time during which the Government pursued an interlocutory appeal of the District Court's order to suppress the evidence seized at Roy's arrest should not be excluded from the Agreement's speedy trial computation. We conclude that the District Court properly excluded this time.

Article VI(a) of the Agreement provides that the running of the 120-day time period "shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter." We have interpreted this language to "exclude all those periods of delay occasioned by the defendant." *United States v. Scheer,* 729 F.2d 164, 168 (2d Cir.1984). The District Court in this case reasoned that excludable time should include the time it takes to resolve a good-faith appeal from the grant of a defendant's pretrial motion.

[T]he submission of the defendant's motion to suppress for a definitive ruling was not complete until after [the District] Court's decision on the matter was reviewed by the Court of Appeals by way of the interlocutory appeal taken by the government. If the government did not seek the review, a trial would have been pointless because all the incriminating evidence against Roy had been suppressed. The appeal was taken in good faith, ... there was no deliberate attempt to delay the trial, and the appeal obviously was not frivolous. Under these circumstances, the orderly and plenary resolution of the crucial issues raised in Roy's motion to suppress included not only the proceedings before [the District] Court, but also included the appellate proceedings that tested the validity of the defendant's legal position as adopted by [the District] Court.

597 F.Supp. at 1216–17. We agree. The time from the filing of Roy's motion to suppress until the conclusion of the appellate process directly attributable to that motion was properly excluded under article VI(a) of the Agreement.

■ Roy's final argument is that article IV(e) of the Agreement requires dismissal of the indictment against him because, following his appearance in federal court, he was not returned to his "original place of imprisonment" until noontime the next day. In *United States v. Chico, supra,* 558 F.2d at 1049 (footnote omitted), this Court held that article IV(e) "does not apply to a case where a prisoner is removed from the prison of a state for a few hours to be arraigned, plead and be sentenced in the federal court without ever being held at any place of imprisonment other than that of the sending state and without interruption of his rehabilitation there." The prisoners in *Chico* were returned on the day of their federal court appearance to the same state institution where they had been confined. In the instant case, Roy was kept overnight at a state institution other than the one in which he was serving his sentence and was

not returned to the original institution until the following day. These circumstances, Roy argues, distinguish his case from *Chico* and constitute a violation of the Agreement necessitating dismissal of the federal indictment against him. We disagree.

In *Chico*, this Court noted two factors in the course of ruling that the Agreement had not been violated: The prisoners there "were never imprisoned by the federal government," 558 F.2d at 1049, and the purposes of the Agreement were "fully satisfied" by their treatment, *id.* The second factor appears to have been dominant. As a technical matter, there was some federal imprisonment of the prisoners in *Chico*, at least in the federal court lockup while awaiting their court appearances. In essence, we recognized in *Chico* that a one-day interruption of state prison confinement posed no threat to a prisoner's rehabilitation sufficient to constitute a violation of the Agreement. Similarly in this case, the Government, acting in response to legitimate concerns, caused a brief interruption in Roy's state custody that in no way detracted from his rehabilitation. Roy's presence in the District Court was needed for only one day. The Government failed to return him to Somers on the evening of April 4 for two valid reasons: concern that a prisoner with a history of escape posed a security risk during a three-hour car ride after dark and concern for the best interests of the prisoner—specifically that he not miss his evening meal. There is no suggestion that either the concern about security or the desire to furnish Roy a hot meal was a pretext for a bad faith decision to delay Roy's return. The few extra hours required to return Roy to Somers on April 5 did not interrupt his rehabilitation, nor deny him any privilege at Somers. *See United States v. Mauro, supra,* 436 U.S. at 359–60, 98 S.Ct. at 1846–47.

Furthermore, we believe that a finding of violation on the circumstances of this case would oblige the Government in future cases to act in conflict with the fundamental purposes of the Agreement. Whenever a prisoner could not be returned safely to his original place of imprisonment on the day of his required attendance in federal court, the Government would be forced to keep the prisoner in its custody throughout the period necessary for final resolution of the federal charges; to do otherwise would risk dismissal of the indictment for technical noncompliance with the Agreement. This practice would frequently result in incarceration for several weeks or months in local jails, often in disadvantageous "holdover" status, thereby unnecessarily interrupting the rehabilitation of the prisoner and bringing about the very evil that the Agreement was enacted to prevent. Construing the Agreement to have been violated in the circumstances of this case, thereby precipitating serious interruption of rehabilitative programs, would not comport with the requirement that the Agreement should be "liberally construed so as to effectuate its purposes." Art. IX.

The judgment of the District Court is affirmed.