08-4267-cr
United States v. Julius

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: April 23, 2009)                                          Decided: June 11, 2010)

Docket No. 08-4267-cr

_____

UNITED STATES OF AMERICA,

Appellant,

-v-

THOMAS JULIUS,

Defendant-Appellee.

_____

Before: POOLER and HALL, Circuit Judges, and SWEET, District Judge.[1]

_____

The United States appeals from the ruling and order, dated August 7, 2008, of the United

States District Court for the District of Connecticut (Chatigny, J.), which held that a firearm

seized during the arrest of the defendant-appellee must be excluded from evidence because it was

obtained as a result of a search which violated the Fourth Amendment to the United States

Constitution.  We remand to give the district court the opportunity to reconsider its decision in

light of the Supreme Court's recent decision in Herring v. United States, 129 S. Ct. 695 (2009).

VACATED and REMANDED.

_____

[1]  The Hon. Robert W. Sweet, United States District Judge for the Southern District of
New York, sitting by designation.

SARAH P. KARWAN, Assistant United States Attorney (Anthony E. Kaplan and William J. Nardini, Assistant United States Attorneys, on the brief), for Nora R. Dannehy, Acting United States Attorney, District of Connecticut, New Haven, CT, for Appellant.

GARY D. WEINBERGER, Assistant Federal Defender (Thomas G. Dennis, Federal Defender, on the brief), Hartford, CT, for Defendant-Appellee.

POOLER, Circuit Judge:

The government appeals from the ruling and order, dated August 7, 2008, of the United States District Court for the District of Connecticut (Chatigny, J.), which granted defendant-appellee Thomas Julius's motion to suppress evidence in the form of a firearm seized in the course of his arrest for violation of his parole. See United States v. Julius, 577 F. Supp. 2d 588 (D. Conn. 2008). The district court earlier denied Julius's motion to suppress ammunition seized during the search that occurred at a later point in time. That ruling is not at issue in this interlocutory appeal. We vacate the district court's ruling and order and remand to give the district court the opportunity to reconsider its decision in light of the Supreme Court's recent decision in Herring v. United States, 129 S. Ct. 695 (2009).

**FACTS**

On October 23, 2007, a federal grand jury sitting in New Haven, Connecticut, returned an indictment charging the defendant, Thomas Julius, with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). The indictment was based upon Julius's prior felony convictions under Connecticut law. As set forth in the indictment, in

2

1998, Julius was convicted of one count of possession of narcotics with intent to sell and two counts of "unlawful restraint." In 2002, he was convicted of one count of possession of narcotics with intent to sell and one count of carrying a pistol without a permit. He was sentenced, on January 2, 2002, in Superior Court for New Haven County, to four years of imprisonment and four years of "special parole."

Julius began his term of special parole upon his release from prison in September 2006. In Connecticut, parole is administered by the Board of Pardons and Paroles ("the Board"). See Conn. Gen. Stat. § 54-124a. The Board is empowered to issue regulations for special parole, is given the authority to hold hearings to determine when special parole has been violated, and may commit a parole violator to prison for all or part of the balance of the term of his parole. See id. § 54-125e(b), (d) & (f).

The conditions of Julius's special parole included, among other things, the requirement that he live at an approved residence, which his parole officer had the right to visit at any reasonable time, that he meet with his parole officer once a week, and that he attend regular counseling sessions. Julius stresses that the conditions of his special parole did not include consent to searches by parole officers. In fact, as the district court noted, the Board did not make consent to search a standard condition of parole until May 2008. See Julius, 577 F. Supp. 2d at 590 n.2.

There is no serious dispute that Julius was in violation of the conditions of his special parole when he was arrested on February 21, 2007.[2] Specifically, as early as mid-October 2006,

_____

[2] We note that Julius hedges somewhat in this regard, claiming that his change in residence without approval was merely a "technical violation" of the terms of his parole, one

3

Julius failed to attend counseling sessions and was found to have left the New Haven residence where he was required to reside for an unknown location. Julius's parole officer, Jose Cartagena, held a number of telephone conversations with Julius, but was unable to persuade him to disclose his location or turn himself in. On December 22, 2006, the Board issued a warrant for Julius's arrest.

Cartagena eventually traced Julius to a residence at 189 English Street, in New Haven, which was the home of Shana Moseley, apparently Julius's then girlfriend. On the morning of February 21, 2007, Cartagena, another parole officer, Daniel Barry, and Deputy U.S. Marshal Charles Wood undertook to arrest Julius at the English Street residence. As described by the district court, the officers knocked on the door and the following events transpired:

> At about 10:10, the officers heard Ms. Moseley ask, "Who is it?" The officers replied, "Parole officers" and "Police." Ms. Moseley said she had to get dressed. A few minutes later, she opened the door. . . . Officer Barry showed her the photograph of the defendant, said they had a warrant for his arrest, and asked if he was inside. . . . Ms. Moseley indicated that the defendant was in the rear of the apartment with her young son, asked the officers to be careful of her son, then moved to the side, permitting them to enter.

Julius, 577 F. Supp. 2d at 591.

Wood and Barry moved to the rear of the apartment, with guns drawn, and encountered Julius, who was lying on a bed with his "head . . . close to the foot of the bed and his arms . . . over his head." Id. at 592. Julius offered no resistance, was placed in handcuffs by Barry and Wood, and led out of the bedroom. And then the following took place:

As Officer Barry was escorting the defendant from the bedroom in handcuffs,

_____

which was not viewed as "irredeemably serious" by his parole officer. Julius, however, provides no support for the argument that he was not in violation of his conditions of parole.

4

> Deputy Wood undertook to search the area in the vicinity of the bed to see if the defendant had discarded a weapon, narcotics or other contraband. Deputy Wood commenced the search by looking through some clothing and other items that were strewn on the floor along the side of the bed where the defendant was taken into custody. Nothing incriminating was found. Next, he lifted the mattress on the bed, which hung over the edge of the box spring by about a foot. Using both hands, he lifted the mattress eighteen inches or so, looked underneath, and saw a pistol. The handle of the pistol protruded slightly over the edge of the box spring. Deputy Wood yelled that he had found a gun, lowered the mattress and suspended the search.

Id.

At the hearing on Julius's motion to suppress, Officer Barry testified that he, Wood, and Cartagena were uncertain what to do at that point: "All we were there for was to find Mr. Julius and take him into custody. We had done that. The weapon being found is out of our parameters or out of the scope of what we do." The officers decided to call for the assistance of the New Haven Police Department.

The officers then asked Moseley for permission to search the entire apartment. After consultation with her mother, who had by that time arrived at the house, Moseley signed a form consenting to the search. New Haven police officers arrived and resumed searching the bedroom and, after completely lifting the mattress from the box spring, discovered a clip of ammunition. 577 F. Supp. 2d at 592-93.

As already noted, Julius was subsequently indicted for possession of both the firearm and the ammunition. He moved to suppress both items as having been obtained as a result of an unreasonable search under the Fourth Amendment. The district court held a hearing on the motion on April 7, 2008, at which Cartagena, Wood and Barry testified, and also a telephone conference with the parties on May 16, 2008. At the latter hearing, the district court orally ruled

5

that Moseley's consent to search the English Street residence was voluntary and that the ammunition found in the course of that search was properly obtained. As already noted, that decision has not been appealed. The district court, however, reserved decision as to the seizure of the firearm.

The district court subsequently ruled that the firearm had been improperly seized. It first rejected the government's contention that Deputy Wood's initial search of the bedroom was a permissible search incident to the arrest of Julius. The district court found that because that search had taken place after Julius had been handcuffed, the mattress under which the firearm was found was plainly beyond his control and therefore not subject to search. 577 F. Supp. 2d at 594. The government does not challenge this portion of the district court's ruling on appeal.

The district court also concluded that Julius's status as a parolee did not legitimize Deputy Wood's initial search. Citing Samson v. California, 547 U.S. 843 (2006), the district court held that a search of a residence occupied by a parolee was subject to a standard of reasonable suspicion, rather than the usual probable cause standard applicable to residences in general. 577 F. Supp. 2d at 597-98. Even under this less demanding standard, however, the district court found that the initial search by Deputy Wood was improper:

> The Government's argument that the officers had reasonable suspicion to search under the mattress boils down to this: (1) the defendant had a criminal record including convictions for possession of a firearm and narcotics; (2) the defendant was an absconder from parole; (3) Ms. Moseley took ten minutes to respond to the officers' knocking at her door; and (4) the mattress was askew. These factors, viewed collectively, did not provide reasonable suspicion that the defendant was hiding a weapon or narcotics under the mattress. The defendant's criminal record and status as an absconder provided no particularized basis for suspecting that he was presently in possession of a weapon or narcotics. Nor did the delay in opening the door. This leaves only the mattress being askew. The Government's theory appears to be that because the mattress was off-center, an experienced

6

officer could reasonably infer that the defendant had hastily concealed a gun or narcotics under the mattress.  In this case, the mattress being askew was insufficient to support such a reasonable inference because the bedroom itself was in a state of disarray and the defendant had ample time to conceal a gun or contraband elsewhere in the apartment.

Id. at 598-99 (citations omitted).  This appeal followed.

**ANALYSIS**

The government asserts that this Court has jurisdiction over this appeal pursuant to 18 U.S.C. § 3731, which provides that an appeal may be taken "from a decision or order of a district court suppressing or excluding evidence . . . if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding."  Julius does not challenge this assertion, and we find that jurisdiction is proper pursuant to Section 3731.

When evaluating a district court's grant of a motion to suppress evidence, we review that court's findings of fact for clear error, considering them in the light most favorable to the government, and we review questions of law de novo.  See United States v. Howood, 489 F.3d 484, 490-91 (2d Cir.), cert. denied, 128 S. Ct. 525 (2007).  We have set forth the basic parameters of our inquiry into the lawfulness of a search as follows:

> The Fourth Amendment restrains the government from performing "unreasonable searches and seizures."  U.S. Const. Amend. IV.  The touchstone in evaluating the permissibility of any search is "reasonableness."  Griffin v. Wisconsin, 483 U.S. 868, 873 (1987).  In most cases, reasonableness requires a warrant and probable cause.  Id.  The Supreme Court has, however, demarcated certain areas in which a lesser – or even nonexistent – level of individualized suspicion is sufficient to render a search constitutional.

United States v. Lifshitz, 369 F.3d 173, 178 (2d Cir. 2004).

No search warrant was issued in connection with the arrest of Julius.  As we declared in

7

Lifshitz, however, "[o]n several occasions, the Supreme Court has indicated that searches of probationers may be pursued without a warrant and under a standard lower than that of probable cause." Id. at 179. As already noted, relying upon Samson, the district court held that a search of a residence occupied by a parolee was subject to a standard of reasonable suspicion, rather than the usual probable cause standard. The principal disagreement between the parties on this appeal is whether this ruling was correct in light of Julius's status as not merely a parolee, but as a parolee who has absconded from supervision by his parole officers.

"It is well-settled that Fourth Amendment protections extend only to unreasonable government intrusions into legitimate expectations of privacy." United States v. Reyes, 283 F.3d 446, 457 (2d Cir. 2002) (quotation marks and alteration omitted). The district court concluded that parolees "'have severely diminished expectations of privacy by virtue of their status alone,'" Julius, 577 F. Supp. 2d at 597 (quoting Samson, 547 U.S. at 852), and if "a parolee is charged with violating his parole conditions and a warrant for his reimprisonment has been issued, the parolee is removed 'one step farther from the constitutional protection enjoyed by ordinary citizens,'" id. (quoting United States v. Polito, 583 F.2d 48, 55 (2d Cir.1978)).

The government contends that, as an absconder from parole who had vacated his sole approved residence, Julius had no reasonable expectation of privacy in the English Street residence at which he was arrested. Accordingly, the government argues, Julius is not cloaked with any Fourth Amendment protection that would allow him to challenge the initial search by Deputy Wood.

The government primarily relies on this Court's decision in United States v. Roy, 734 F.2d 108 (2d Cir. 1984). In Roy, "[t]he threshold question [was] whether Roy, as an escaped

8

felon, had a legitimate expectation of privacy in the automobile that was violated by the search which occurred" subsequent to his arrest. Id. at 110. We concluded that Roy's "expectation of privacy in the automobile is not one that society is prepared to recognize as legitimate" because, as an escapee, "Roy was no more than a trespasser on society." Id. at 110-11. As such, "he should have the same privacy expectations in property in his possession inside and outside the prison" and "[t]here is no question that Roy would not have had a legitimate expectation of privacy in a motor vehicle operated on prison grounds." Id. at 111.

Julius's primary response is to point out that, as we have already noted, consent to search of his residence was not made a condition of his parole and he therefore had a legitimate expectation of privacy. From this, Julius reasons that just as Roy had the same expectation of privacy in prison and as an escapee, he "had the same privacy expectations in his approved residence and in his new one."

We decline to reach this issue because we are not confident the district court would reach the same conclusion that suppression is proper in light of Herring v. United States, 129 S. Ct. 695 (2009), decided January 14, 2009, after the district court's decision in this case. However, we note that other district courts in this Circuit have given more weight to the fact that a parolee absconded in considering whether a search violated the Fourth Amendment. See, e.g., United States v. Pabon, 603 F. Supp. 2d 406, 416 (N.D.N.Y. 2009) (upholding propriety of search of "a known absconder in direct violation of parole"); United States v. White, 622 F.Supp. 2d. 34 (S.D.N.Y. 2008) (parole officer's search of apartment "was rationally and reasonably related to his duties as a New York State Parole Officer" because "Defendant had absconded," his unapproved "presence at the Apartment was in itself a separate violation of his parole," another

9

parolee had just exited the apartment in possession of crack cocaine, and Defendant refused to surrender for an hour, suggesting to the officers that "he possessed something that he did not want the officers to see"). Nothing in our decision today bars the district court from revisiting its earlier ruling as to whether the search violated the Fourth Amendment.

We remand for the district court to consider whether, if Deputy Wood's search was conducted in violation of the Fourth Amendment, the exclusionary rule applies in light of Herring. Herring involved a defendant whose automobile was searched after he was arrested by an officer who had been misinformed that there was an outstanding warrant for Herring's arrest. The error resulted from "negligent bookkeeping." Herring, 129 S. Ct. at 698. Another police employee had failed to update the sheriff's computer records to note that the warrant for Herring's arrest had been rescinded. Id. Acknowledging that the search was in violation of the Fourth Amendment, the Court considered whether the application of the exclusionary rule – that is, the rule that illegally obtained evidence must be excluded from any subsequent prosecution – was a proper remedy for the violation. Id. at 700.

Above all else, Herring makes plain that a search that is found to be violative of the Fourth Amendment does not trigger automatic application of the exclusionary rule. That is, application of the exclusionary rule is not a matter of right upon a finding that an improper search has taken place. Rather, "the exclusionary rule is not an individual right and applies only where . . . [it serves the purpose of] deterring Fourth Amendment violations in the future." Id. Further, in light of the costs of letting a guilty defendant go free because of the exclusion of possibly probative, but improperly obtained, evidence from use in his prosecution, a court should order exclusion only after it has satisfied itself that "the benefits of deterrence . . . outweigh the costs."

10

Id. The Court declared that the costs of applying the exclusionary rule are generally substantial:

> The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free – something that "offends basic concepts of the criminal justice system." [United States v. Leon, 468 U.S. 897, 908 (1984)]. "[T]he rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." [Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 364-65 (1998)] (internal quotation marks omitted); see also United States v. Havens, 446 U.S. 620, 626-27 (1980); United States v. Payner, 447 U.S. 727, 734 (1980).

Id. at 701.

> In light of these costs, the Court concluded:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

Id. at 702. The bookkeeping error, as "isolated negligence attenuated from the arrest," was too far from the "core concerns" that gave rise to the exclusionary rule – "intentional conduct that was patently unconstitutional." Id. at 698, 702.

The district court here could not have known of the requirement that it perform the cost/benefit analysis required by Herring. Thus, we remand for consideration of whether the deterrent effect of applying the exclusionary rule outweighs the cost of the rule's application, for example, whether the degree of police culpability in this case rose beyond mere administrative negligence such that application of the rule is necessary to compel respect for the Fourth Amendment's guarantees. Id. at 704.

Assuming the district court adheres to its prior conclusion that the search was constitutionally infirm, on remand, the district court may consider whether the circumstances of

11

this search, considered in their totality, support application of the exclusionary rule under Herring. Herring, 129 S. Ct. at 711 (Breyer, J., dissenting) (describing the majority's approach as a "case-by-case, multifactored inquiry into the degree of police culpability"). Unlike in Herring, in which the alleged error was attenuated from the search, the error here was made by the searching officer. Also unlike Herring, this case involves a warrantless search, which entails different concerns about deterrence of police misconduct. Officer Barry testified that "[t]he weapon being found is out of our parameters or out of the scope of what we do." Wood, the officer who conducted the search, however, testified that he thought he had a right to search the area within the arrestee's reach at the time of the arrest regardless of the arrestee's status at the time of the search as long as it was within a reasonable amount of time after the arrest. The district court may consider whether the other circumstances of the search support a finding that the "law enforcement officer[s] had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment," requiring suppression. Herring, 129 S. Ct. at 702 (quotation marks omitted). The district court may consider whether any of the four grounds relied upon by the government as justifying Deputy Wood's initial search, see supra at **[6-7]**, suggested the requisite level of culpability on the part of the officers.

On the other hand, there is no question that the arrest of Julius was justified because it is undisputed that he was in violation of the terms of his special parole. The search itself was not prolonged; Officer Barry testified that "less than two minutes" had elapsed between the arrest of Julius and Deputy Wood's announcement that he had found a gun. Further, the court may also consider the issue of officer safety when deciding whether the conduct of the officers was "the result of . . . systemic error or reckless disregard of constitutional requirements." See, Herring,

12

129 S.Ct. at 704. Deputy Wood articulated a concern for the safety of the officers and others. He explained there was minimal possibility that Julius could have obtained the gun "because he was restrained," but that there was a risk that the minor child "could have accessed the weapon accidently" or that Ms. Moseley could have obtained the weapon if allowed to get clothes for Julius.[3] Additionally, immediately upon finding the firearm, Deputy Wood and his colleagues: (1) ceased searching; (2) obtained Ms. Moseley's permission to search the entire residence, permission that the district court found was properly obtained; and (3) contacted New Haven police officers for assistance. We do not conclude that any of these circumstances are necessarily dispositive.

We emphasize that Herring should not serve as an enticement for law enforcement personnel to depart from search procedures which comply with the Fourth Amendment. Rather, Herring requires careful consideration by district courts of whether the goal of deterring violations of the Fourth Amendment outweighs the costs to truth-seeking and law enforcement objectives in each case.

## CONCLUSION

The decision of the district court is VACATED and REMANDED for further proceedings consistent with this opinion.

---

[3] Wood testified: "the possibility exists that the defendant could have accessed it, minimally, because he's restrained at that point. The minor child could have accessed it accidentally either while we were there or after we left. And Ms. Moseley could have accessed it if we had let our guard down and permitted her to go in that room and obtain clothing from where the defendant was apprehended."