**UNITED STATES of America, Appellee,**

v.

**Alvin Odell CLUCK, Appellant.**

**No. 76–1469.**

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 17, 1976.

Decided Oct. 7, 1976.

Certiorari Denied Nov. 29, 1976.
See 97 S.Ct. 506.

Howard E. McNier, St. Louis, Mo., for appellant.

Barry A. Short, U.S. Atty. and Richard E. Coughlin, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before GIBSON, Chief Judge, and STEPHENSON and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

Alvin Odell Cluck, defendant-appellant, was convicted by a jury in the United States District Court for the Eastern District of Missouri of having unlawfully escaped from the St. Louis County Hospital on or about January 19, 1976 in violation of 18 U.S.C. § 751(a). A post-trial motion for judgment notwithstanding the verdict, or, alternatively, for a new trial was overruled by the district court,[1] and defendant was sentenced to imprisonment for a period of eighteen months.

Defendant contends for reversal that the indictment should have been dismissed, that he was entitled to a judgment of acquittal, that the jury was improperly instructed, and that the district court committed a number of trial errors.

Before discussing the facts of the case and the contentions of the defendant, we deem it well to state briefly some of the governing principles of law.

The statute under which the defendant was charged provides in substance that any person who escapes or attempts to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General, is guilty of a federal offense. If the custody arose out of a felony charge or conviction of any offense, the escape or attempted escape is a felony. The defendant in the instant case was allegedly in federal custody for the purpose of serving the remainder of a four year sentence imposed on him by the district court in 1973.

In *United States v. Nix*, 501 F.2d 516 (7th Cir. 1974), the court defined an "escape" as being a voluntary departure from custody with intent to avoid confinement.[2] Although there must be an escape from custody, it is not necessary that the escapee at the time of the escape be held under guard or under direct physical restraint or that the escape be from a conventional penal housing unit such as a cell or cell block; the custody may be minimal and, indeed, may be constructive. *United States v. Leonard*, 162 U.S.App.D.C. 212, 498 F.2d 754 (1974); *United States v. Wilke*, 450 F.2d 877 (9th Cir. 1971), *cert. denied*, 409 U.S. 918, 93 S.Ct. 250, 34 L.Ed.2d 180 (1972); *United States v. Hollen*, 393 F.2d 479 (4th Cir. 1968); *McCullough v. United States*, 369 F.2d 548 (8th Cir. 1966); *Nace v. United States*, 334 F.2d 235 (8th Cir. 1964), *aff'g* 231 F.Supp. 528 (D.Minn.); *Tucker v. United States*, 251 F.2d 794 (9th Cir. 1958); *Giles v. United States*, 157 F.2d 588 (9th Cir. 1946), *cert. denied*, 331 U.S. 813, 67 S.Ct. 1197, 91 L.Ed. 1832 (1947). Specifically, the escape may be from a hospital in which the escapee was properly confined. *Frazier v. United States*, 119 U.S.App.D.C. 246, 339 F.2d 745 (1964); *Tucker v. United States, supra*.

---

1. The Honorable H. Kenneth Wangelin, United States District Judge.

2. The statute does not in terms make intent an essential element of the offense. The departure from custody must, of course, be voluntary and conscious. *See United States v. Snow*, 157 U.S.App.D.C. 331, 484 F.2d 811 (1972). In any event, the case was tried on the theory that it was incumbent on the government to prove wilfulness and intent to escape, and that theory became the law of the case. *United States v. Woodring*, 464 F.2d 1248 (10th Cir. 1972).

■ If an individual is in custody under process issued pursuant to the laws of the United States, he cannot test the underlying validity or propriety of his confinement by escaping from it. *United States v. Herrera*, 504 F.2d 859 (5th Cir. 1974); *United States v. Allen*, 432 F.2d 939 (10th Cir. 1970); *Derengowski v. United States*, 404 F.2d 778 (8th Cir. 1968), *cert. denied*, 394 U.S. 1024, 89 S.Ct. 1640, 23 L.Ed.2d 49 (1969); *Godwin v. United States*, 185 F.2d 411 (8th Cir. 1950).

■ Assuming that specific intent to escape is an element of the offense defined by § 751(a), it is settled that the government need not prove the existence of unlawful intent at the moment at which a prisoner or convict departs from custody. Even if such a person leaves his place of confinement involuntarily or inadvertently, nevertheless if at a later time he voluntarily forms an intent to remain at large and acts upon it, that is sufficient to sustain a conviction of escape. *United States v. Woodring*, 464 F.2d 1248 (10th Cir. 1972); *United States v. Chapman*, 455 F.2d 746 (5th Cir. 1972); *Chandler v. United States*, 378 F.2d 906 (9th Cir. 1967); *see also United States v. Coggins*, 398 F.2d 668 (4th Cir. 1968).

Apart from his contentions that the indictment should have been dismissed and that the trial court erred in certain of its rulings, the basic position of the defendant is that although he in fact left the Hospital during the early morning hours of January 19, 1976, his departure from the institution as a matter of law was not a violation of § 751(a), and that a judgment of acquittal should have been entered in his favor.

The defendant contends that while a patient in the Hospital from January 11 until his departure therefrom he was not actually in "custody"; that the Hospital was not an institution designated for his confinement by the Attorney General; and that when he left the Hospital and thereafter he was in such a state of drug induced stupor that he was incapable of forming any specific intent to escape. He contends that after he left the Hospital he made contact with a friend, James Caudel, and later with his wife, Mary Cluck; that he was advised by his wife that she had talked with the United States Marshal for the Eastern District of Missouri and with a responsible official of St. Louis County, and that they had advised her that defendant would not be prosecuted for escape if he gave himself up promptly, and that he was making a good faith effort to surrender himself to the Marshal when he was apprehended by local police officers fairly early in the evening of January 20.

■ Many of the facts of the case are substantially undisputed. As to others, there are sharp conflicts in the evidence. In passing upon the question of whether the government made a submissible case and whether there was substantial evidence to sustain the verdict, we are required to view the evidence in the light most favorable to the government, and to give the government the benefit of all inferences favorable to it reasonably to be drawn from the evidence. *United States v. McColgin*, 535 F.2d 471 (8th Cir. 1976); *United States v. Wisdom*, 534 F.2d 1306 (8th Cir. 1976). And it must be kept in mind that if the case was properly submitted to the jury, it was for the jury to pass upon the credibility of witnesses and the weight to be given to their testimony, and to resolve conflicts in the testimony.

The defendant is a recidivist criminal with a record of convictions going back to about 1965. In 1972 he was convicted in St. Louis County on charges of forgery and uttering and was sentenced to imprisonment for six years in the Missouri State Penitentiary. He testified that while in that institution he became addicted to the use of narcotic drugs and was an addict during late 1975 and early 1976.

In 1973 defendant was convicted in the district court of a federal firearms violation and was sentenced to imprisonment for four years with a recommendation that the federal sentence be served concurrently with the sentence that he was then serving in the state institution.

That recommendation was honored by the Attorney General, and the Missouri

State Penitentiary was designated as a place for the service of defendant's federal sentence. However, the Bureau of Prisons failed to lodge a detainer against the defendant, and he was released from custody in July, 1975 with at least some months left to serve on his federal sentence.

In November, 1975 defendant was arrested and jailed on Missouri state charges, and it appears that as of that time a federal detainer based on the 1973 conviction was lodged with the local authorities. In December, 1975 defendant was handed over to the United States Marshal for the Eastern District of Missouri, and was confined for a time in the St. Clair County Jail in Belleville, Illinois.

In 1975 and 1976 the Federal Bureau of Prisons, which is an agency in the Department of Justice, had a contract with St. Louis County under the terms of which federal convicts in certain categories might serve all or part of their sentences in the St. Louis County Correctional Institution. Another institution operated by St. Louis County is the St. Louis County Hospital; inmates of the Correctional Institution who have need of hospital care are usually, or at least frequently, transferred to the County Hospital.

The Hospital is not a penal institution; it has no "prison ward"; its windows are not barred; and patients are not locked in their rooms. Some inmates of the Correctional Institution who are transferred to the Hospital are kept there under personal guard, but others are not. If an inmate of the Correctional Institution is transferred to the Hospital but is not accompanied by a guard, there is no way to distinguish the inmate patient from other patients.

In late December, 1975 the Bureau of Prisons designated the Correctional Institution as the place at which the defendant was to serve the rest of his federal sentence, and he was placed in the Institution by the Marshal.

Although confined at the Correctional Institution, the defendant seems to have been able to keep himself supplied with drugs which he administered to himself by means of a needle. As sometimes happens in such cases, the needle became contaminated, and the defendant contracted hepatitis.

By January 11, 1976 defendant was severely ill, or claimed to be, and he was transferred to the Hospital. He testified that he was brought to the Hospital in an ambulance and under guard, and that he was initially handcuffed to his bed. Later, however, according to defendant's testimony, the handcuffs were removed and the guard left the premises informing the defendant that "he was on his own."

Those portions of defendant's testimony were neither corroborated nor contradicted. It is clear that by January 18 the defendant was assigned to Room 113 which is on the first floor of one of the Hospital buildings. He was dressed in conventional hospital garb and was permitted to roam around the first floor more or less at will and to receive visits from members of his family.[3] While in the Hospital defendant's craving for drugs was satisfied to some extent by medications administered by the hospital staff supplemented by illicit drugs that the defendant had in his possession.

Defendant is a married man with one daughter. January 18, 1976 was the child's fourth birthday, and she and her mother, defendant's wife, came to visit the defendant during the late afternoon and early evening. The family was in poor financial circumstances, and defendant had not been able to contribute anything to their support. He testified that he was depressed by the visit, and also that he was nearly out of drugs and feared the onset of withdrawal symptoms.

Defendant was last seen by Hospital personnel when two nurses made late evening rounds between eleven o'clock and midnight. When one of the same nurses made morning rounds on January 19, the defend-

---

3. The defendant was a resident of St. Louis County during the period with which we are concerned.

ant had disappeared from his room and had left the Hospital. He was not seen again until the early evening of January 20 when he, his wife and James Caudel were detained initially by members of the St. Louis County Police Department at a point some ten miles away from downtown St. Louis.

At the time of that detention defendant and his wife were riding in Caudel's car. The vehicle was observed by Detective Thomas Gilyon and another officer who became suspicious of its appearance and the manner in which it was being driven. The officers stopped the vehicle and called for an assist vehicle; as a result of that call Lieutenant Stephen Gleason appeared on the scene.

Neither the defendant nor his wife had any identifying papers on their persons, and they gave their names as Donald and Mary Borden. The defendant and his wife were not held originally, and in fact Lieutenant Gleason drove them in his car back to a parking lot where they had left their own car. Gleason permitted them to go to their car; however, he kept them under surveillance and caused a check to be made of the license plate on that car. He received information which caused him to require the defendant and his wife to go to the police station.

The evidence is sharply conflicting as to what took place at the station. The defendant and his wife testified that when Caudel's car was stopped, the party was in search of a telephone booth from which it was contemplated that the defendant or his wife would call the United States Marshal so that the defendant could be picked up, that when they reached the station the defendant readily admitted his true identity, that a request was made to the officers to telephone the Marshal, that the defendant's wife gave the officers a telephone number which was called, but that no answer was received.

The officers testified on the other hand that for a substantial period of time the defendant persisted in contending that his name was Donald Borden, and that he did not reveal his true identity until called upon to roll up his sleeves so that the officers could look for tattoo marks known to be on the arms of the defendant. Lieutenant Gleason did testify that the defendant's wife asked him to call a certain number which he did without success. The wife did not tell him that the number was that of the Marshal, and he did not know that it was; she did not indicate that there was any urgency about the call.

After the defendant admitted his identity, he was returned to federal custody and shortly thereafter was transferred to the Medical Center for Federal Prisoners at Springfield, Missouri, so that he could be treated for his drug addiction.

No question is raised as to the testimony of the nurses to the effect that defendant was last seen in the Hospital between 11:00 p.m. and midnight on January 18. It is inferable that the defendant left the Hospital in the early hours of January 19, and that he made his egress through an exterior door on the first floor of the building which could be opened at will from the inside but which would latch upon being closed so that it could not be opened from the outside.

The period between the time at which the defendant left the Hospital and the time at which the Caudel car was stopped by the officers is covered by nothing but the uncorroborated testimony of the defendant and his wife.[4] The story told by the defendant is bizarre to say the least, and in certain material respects it conflicts with the testimony of the wife. The testimony of the defendant also conflicts with a statement that he made to Special Agent Ronald W. Parker of the Federal Bureau of Investigation following his apprehension.

The defendant testified that after his wife and daughter ended their visit, he administered to himself all of his remaining drugs and fell into a state of stupor or confusion; that he wandered around the first floor of the Hospital looking for a

4. Caudel was subpoenaed as a defense witness. However, he invoked his privilege against self-incrimination and did not actually take the stand.

telephone that was not in use and accidentally wandered through the exterior door and found himself locked out. It may be noted that the defendant was the only person who testified as to the condition that he was in when he left the Hospital or as to how he left it.

The defendant further testified that when he left the Hospital, he was lightly clothed, and that the weather was very cold. He said that he panicked at this point. However, he also testified that he knew that he had to get off the street; that his car, with wife in it, was parked nearby, and that he went to the car and took it away from his wife, telling her that he would call her later.

However, his wife testified that after she and the child left the Hospital on the evening of January 18, she did not see the defendant again until January 20.

Interviewed by Special Agent Parker, the defendant stated simply that he had left the Hospital for the purpose of rendering financial assistance to his wife and child.[5]

No useful purpose would be served by setting out any further evidentiary details at this point, and we pass to a consideration of the issues presented by the record.

We take up, first, the claim of the defendant that the indictment was insufficient. That pleading charged that on or about January 19, 1976 in the Eastern District of Missouri the defendant wilfully and unlawfully escaped from the custody of the Attorney General or his authorized representative; it was said that the defendant was in that custody on November 6, 1975. The indictment made reference to § 751(a).

It may be conceded to the defendant that the indictment was poorly drawn. No reference was made to the fact that defendant had allegedly escaped from the Hospital rather than from some other place of confinement. No reference was made to the

1973 judgment of the district court, and the reference to November 6, 1975 was erroneous. On that date the defendant was in state custody, and was not returned to federal custody until December, 1975.

■ But the defendant did not move for a bill of particulars, and we think that the indictment was sufficient to advise defendant of the charge against him and to protect him from a second prosecution for the same offense. The defendant and his attorney obviously knew that the former was charged with having escaped from the Hospital, and it is clear that the defendant has never been in any danger of being prosecuted twice for that escape.

■ Defendant argues that since before he was indicted the Bureau of Prisons denied him credit for one day's service on his 1973 sentence he had been administratively punished, and that his prosecution in the instant case constituted double jeopardy. That claim is frivolous. *United States v. Salazar*, 505 F.2d 72 (8th Cir. 1974).

■ One of the principal contentions of the defendant is that he was not in "federal custody" while he was a patient at the Hospital. This contention is largely based on the fact that the Bureau of Prisons had no contract with the Hospital itself in January, 1976. There is no merit to that contention. Rufus W. Graham, Community Programs Officer of the Bureau of Prisons, testified without contradiction that the Bureau had an over-all contract with the County for the care, maintenance, and custody of federal prisoners, including federal convicts assigned to the Correctional Institution. We think that the designation of the Correctional Institution as a place for the service by defendant of what was left of his 1973 federal sentence was tantamount to a designation of the Hospital as a place of federal confinement should the defendant while in the Correctional Institu-

---

5. In the circumstances, any ability of the defendant to provide financial help to his family would probably have depended upon his engaging in criminal activity. He testified that after he left the Hospital, he obtained more drugs which he consumed, that shortly thereafter he

contacted Caudel, and that from that time on until the Caudel car was stopped by the officers he was in the company of Caudel and later in the company of Caudel and defendant's wife. As heretofore noted, Caudel refused to testify in the case.

tion find himself in need of hospital services. *See Tucker v. United States, supra.*

■ Defendant argues further that as of January 18–19, 1976 he was not in the physical custody of any authority, state or federal. As has been seen, a person may be in custody for purposes of § 751(a) even though the physical restraints upon him are minimal and even though the custody be deemed constructive, rather than actual. We think that the jury could properly find that the defendant was in "custody," and we observe that in the course of his testimony the defendant did not indicate that he ever thought that he was free to leave the institution.

This brings us, at length, to what appears to us to be the only really serious question in the case, namely, whether there was substantial evidence from which the jury could find under proper instructions of the trial court that the defendant left the Hospital wilfully and with the specific intent to avoid further confinement therein. As far as the sufficiency of the evidence is concerned, the review standards that we employ have been mentioned already.

Assuming that the jury was properly instructed, we think that there was ample evidence to sustain the verdict.

■ The jury was not required to accept the testimony of the defendant and his wife, and certainly it was not required to accept that testimony where it conflicted with that of the law enforcement officers involved in the case.

■ The jury could permissibly have found the defendant guilty on either of two hypotheses.

The jury may justifiably have believed that on the evening of January 18 the defendant and his wife planned for the defendant to leave the building at a later hour, that the wife would be waiting for him in the family car, and that the couple would leave the Hospital premises in the car with an intent on the part of the defendant to avoid further confinement in the institution. Under that hypothesis the claim of the defendant that he left the institution by accident while in a drug induced stupor would have been rejected. As has been seen, that claim was supported by nothing but the defendant's own testimony.

Alternatively, the jury may have believed that even if the defendant left the Hospital initially while in a stupor and without any ability to form a specific intent to escape, he later recovered his senses and simply decided to remain at large.

And the jury was not required to believe that when the Caudel car was stopped, the defendant and his wife were making a good faith effort to contact the Marshal.

■ The defendant complains only about the instructions relating to custody and intent. There was no objection to the instruction on custody and only a vague objection to the instruction on intent. We have considered those instructions along with the other instructions given by the trial court, and we find that the instructions, including the challenged ones, stated the applicable law fairly and correctly and did not invade the province of the jury.

The remaining contentions of the defendant may be disposed of briefly.

■ Special Agent Parker testified in rebuttal as to a conversation that he had with the defendant's wife on January 23. On cross-examination he admitted that although he felt that she might have been criminally involved in the escape of the defendant, he did not advise her of her *Miranda* rights. Defendant argues that the testimony should have been stricken from the record. We reject that argument; the defendant has no standing to complain of the fact that his wife was not advised of her own constitutional rights.

■ Prior to the trial defense counsel was permitted to examine the investigative report of Special Agent Parker. That report contained a statement to the effect that the defendant had been arrested on December 19, 1975 and had been placed in the St. Louis City Workhouse. As defense counsel must have known, that statement was an error because the defendant was in

jail prior to December 19 and was in continuous custody until he left the Hospital on January 19. In the course of the cross-examination of Parker defense counsel deliberately called the jury's attention to the mistake just mentioned. Counsel for the government objected to further questioning along the line in question, and the objection was sustained on the grounds that the questioning went beyond the scope of the Agent's direct examination and related to a collateral matter. We see no error. If there was error, it was harmless since it must have been as obvious to the jury as it was to anyone else that the statement in the report was a mistake.

For the purpose of showing that as of January 18–19, 1976 the defendant had only a short time left to serve on his 1973 federal sentence and for that reason would have been unlikely to escape, defense counsel offered as evidence copies of certain documents on file in a habeas corpus proceeding that defendant had commenced in the Western District of Missouri after he had been transported to the Medical Center at Springfield. The district court refused to admit the proffered material. Again we see no error. The escape had taken place before the habeas corpus petition was filed, and the habeas corpus case had not been disposed of at the time of trial. Moreover, in the course of his own testimony, the defendant had told the jury that according to his own computation his sentence would have expired in early February, 1976. He thus was permitted to make his point.

Finally, the defendant complains about the fact the government did not call Warden Parker of the Correctional Institution and United States Marshal Link as witnesses to rebut the testimony of the defendant's wife about conversations that she allegedly had with them in the course of which they allegedly stated that if the defendant would give himself up promptly he would not be prosecuted. The government was not under any obligation to call witnesses to rebut the testimony of defendant's wife. Aside from that it was immaterial what Warden Parker and Marshal Link

may have told defendant's wife. They had no authority to promise the defendant any immunity from prosecution, and their prediction as to what would or might happen if he gave himself up had no bearing on the question of his initial guilt or innocence.

Finding no error, we affirm the judgment of the district court.