**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Michael ROY, Defendant-Appellant.**

No. 86–1382.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 1987.

Decided Sept. 4, 1987.

Charles W. Hoffman, Office of the State Appellate Defender, Chicago, Ill., for defendant-appellant.

Mark Pollack, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD, and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

Appellant, Michael Roy, appeals from a judgment of conviction for escape from federal custody in violation of 18 U.S.C. § 751. Through counsel, Mr. Roy claims that his indictment should have been dismissed because the government failed to comply with the Interstate Agreement on Detainers. In a brief filed pro se, Mr. Roy raises a variety of other challenges to his conviction. Because we find no merit to Mr. Roy's contentions, we affirm the judgment of the district court.

I

Facts

A.

The appellant was taken into custody in Illinois upon a warrant issued for his arrest by the United States District Court for the Middle District of Florida. The warrant charged Mr. Roy with bank robbery. On the date of his arrest, Mr. Roy was brought before a United States Magistrate in the Northern District of Illinois who issued a temporary commitment order and set bond at $500,000. Pursuant to the magistrate's order, Mr. Roy was held at the Metropolitan Correctional Center (MCC) in Chicago, Illinois. He did not post the required bond and therefore remained in custody.

The evidence at trial established that Mr. Roy escaped from the MCC about a month after his commitment. The escape was effectuated by cutting through a vent in a warehouse area that permitted passage to the street.

Two months after his escape from the MCC, Mr. Roy was apprehended in Weathersfield, Connecticut. At trial, he did not contest that he had escaped from the MCC but, proceeding pro se,[1] offered the defenses of duress and insanity.

### B.

Mr. Roy's activities from the time of his apprehension in Connecticut until his trial on the charge before us in this appeal are also relevant to the issue raised by his appointed counsel. Counsel has provided the court in his brief with a helpful chronology that, with several minor adjustments in the interest of clarity, will provide a foundation for our analysis.

*December 3, 1982*

Defendant was arrested by officers of the Rocky Hill, Connecticut Police Department. He was incarcerated at the Hartford Community Correctional Center (Hartford CCC) in lieu of bail as a state pretrial detainee on a state criminal charge of attempted robbery.

*December 8, 1982*

A federal detainer was filed against defendant at the Hartford CCC based on a federal escape charge pending against defendant in the Northern District of Illinois, that alleged that, on October 3, 1982, defendant had escaped from the MCC in Chicago. This is the charge before the court in this case.

*December 16, 1982*

Defendant was transferred from the Hartford CCC to another state institution,

the Connecticut Correctional Institution at Somers, Connecticut (Somers CCI).

*January 27, 1983*

Defendant's Connecticut state parole (from a previous state conviction) was revoked. Defendant's status changed from a state pretrial detainee to a state prisoner serving a state sentence in a state institution.

*January 28–29, 1983*

A detainer was filed at Somers CCI by California state authorities relating to pending charges in that state. A similar detainer was filed by Massachusetts.

*February 24, 1983*

Defendant was indicted in the federal District of Connecticut for federal weapons violations. A federal detainer based on these charges was lodged with the Hartford CCC, although the defendant had been at Somers CCI since December 16, 1982. This detainer was forwarded to Somers, arriving there on March 3, 1983.

*Febuary 28, 1983*

The federal government secured a writ of *habeas corpus ad prosequendum* in regard to the federal weapons charge pending in the District of Connecticut.

*March 2, 1983*

Pursuant to an order to produce based upon the writ, the defendant was transferred to the custody of the U.S. Marshals Service and Transported from Somers CCI to federal district court in Bridgeport, Connecticut. On that same date, defendant was transported back to state custody at Somers CCI.

*March 17, 1983*

Defendant filed several pretrial motions in the Connecticut federal case, including a motion to suppress evidence.

---

1. Mr. Roy was initially represented by appointed counsel, John L. Sullivan, Esquire. During pretrial proceedings, Mr. Roy requested that Mr. Sullivan be relieved and that another lawyer be appointed. Mr. Sullivan's request to withdraw was granted. Robert S. Bailey, Esquire was then appointed but later was permitted to withdraw. Richard Kling, Esquire was then ap-

pointed. He also moved to withdraw on the ground of "irreconcilable conflict" with his client. The motion was initially denied. Thereafter, Mr. Roy filed a motion seeking leave of court to proceed pro se. The court granted this motion but ordered Mr. Kling to act as "standby" counsel.

*March 24, 1983*

Defendant delivered to officials of the Somers CCI a request that they file demands for speedy trial on all detainers pending against him.

*April 4, 1983*

Pursuant to a second order to produce based on the writ of *habeas corpus ad prosequendum* issued on February 28, 1983, regarding the federal weapons charge pending in the District of Connecticut, U.S. Marshals again took defendant into federal custody at Somers CCI and transported him to federal court at Bridgeport, Connecticut for a hearing on defendant's motion to suppress.

*April 4, 1983*

Defendant was housed overnight at the Community Correctional Center in Bridgeport, Connecticut as a federal holdover prisoner in federal custody.

*April 5, 1983*

Defendant was transferred from federal custody back to state custody at Somers CCI.

*May 5, 1983*

Defendant delivered to officials of the Somers CCI a second request that they file demands for speedy trial on the detainer pending against him for escape from federal custody in Chicago.

*June 14, 1983*

Defendant was transported to California for resolution of pending charges in that state.

*July 22, 1983*

The California charges were dismissed.

*August 2, 1983*

Defendant was returned from California to Somers CCI.

*August 9, 1983*

The federal district court in Connecticut granted defendant's motion to suppress evidence.

**2.** Mr. Roy received a sentence of seven years. This conviction has been affirmed by the Second Circuit. *United States v. Roy,* 771 F.2d 54

*September 8–12, 1983*

A third federal detainer was filed at Somers CCI relating to bank robbery charges pending against defendant in federal court in Florida.

*September 16, 1983*

The government filed a notice of appeal from the order of the Connecticut District Court granting defendant's motion to suppress.

*September 20, 1983*

Defendant filed a demand for speedy trial on the pending federal charges in Florida.

*October 17, 1983*

A writ of *habeas corpus ad prosequendum* was filed at Somers CCI regarding the federal charges pending in Florida.

*October 24, 1983*

Defendant was transported by federal officials from Somers CCI to federal custody in Florida for trial.

*February 16, 1984*

While defendant was a state prisoner in temporary federal custody in Florida, his Connecticut state sentence expired and he became a federal pretrial detainee.

*May 3, 1984*

The Court of Appeals for the Second Circuit reversed the ruling of the Connecticut District Court on the motion to suppress and remanded the case for trial.

*June 8, 1984*

After disposition (by acquittal) of the federal charges in Florida, defendant returned to Somers CCI (as a federal pretrial detainee) for trial on the federal charges pending in Connecticut.

*December 17, 1984*

Defendant was convicted of federal weapons violations in the District of Connecticut.

*January 28, 1985*

Defendant was sentenced on the Connecticut federal conviction.[2]

(2d Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1520, 89 L.Ed.2d 918 (1986).

*February 11, 1985*

A writ of *habeas corpus ad prosequendum* was issued and forwarded to the FCI at Danbury, Connecticut with respect to the federal escape charge pending in the Northern District of Illinois.

*March 7, 1985*

Defendant was arraigned in federal court in the Northern District of Illinois on the federal escape charge.

*July 3, 1985*

Defendant filed a motion to dismiss the escape charge based on alleged violations of the Interstate Agreement on Detainers. *See* Appellant's Br. at 8–13. Mr. Roy's motion was denied. After a jury trial, he was convicted of escape under 18 U.S.C. § 751(a) on January 17, 1986.

## II

## Appellant's Contentions

Through his appointed counsel, Mr. Roy brings several contentions based on the Interstate Agreement on Detainers (IAD), 18 U.S.C. App. III § 2. Mr. Roy submits that the indictment should be dismissed: 1) because he was not tried within 180 days of his request for speedy trial on all detainers lodged against him in violation of art. III(a); and 2) because he was taken from state custody to federal custody and returned to state custody without being tried on this federal charge in violation of art. IV(e).

Mr. Roy also raises, in his pro se brief, numerous other challenges to his conviction. He claims that the court erroneously refused to instruct the jury regarding several aspects of his defense. Additionally, he claims that the section of the criminal code under which he was convicted, 18 U.S.C. § 751(a) is unconstitutional. He also submits that he suffered undue prejudice because: 1) the court failed to appoint an investigator and issue subpoenas for him; 2) jail officials violated his rights by interfering with his preparation of a defense; and 3) he received ineffective assistance of counsel.

## III

## Analysis

### A. *The IAD Claims*

The Interstate Agreement on Detainers (the Agreement or IAD), 18 U.S.C. App. III § 2, provides an interstate mechanism by which a prisoner in a signatory jurisdiction (sending state) may secure trial on all charges for which detainers have been lodged against him by other signatory jurisdictions (receiving states). *Id.* at art. III(a). While not directly relevant here, the IAD also provides that a receiving state may also initiate a request for a prisoner from the sending state in the absence of a request by the prisoner. *Id.* at art. IV(a). As Judge Newman pointed out for the Second Circuit in affirming Mr. Roy's conviction for federal firearms violations in Connecticut:

> The Interstate Agreement on Detainers Act (the "Agreement"), 18 U.S.C. App. pp. 545–48 (1982), provides a mechanism by which a prosecutor in one jurisdiction, the "[r]eceiving [s]tate," *id.* art. II(c), may secure the presence of a prisoner who is serving a sentence in another jurisdiction, the "[s]ending [s]tate," *id.* art. II(b), in order to try him on charges pending in the receiving state, *id.* art. IV(a). Once the receiving state commences criminal proceedings through this mechanism, the Agreement affords the prisoner certain protections. Article IV(c) provides that the prisoner's trial in the receiving state must be commenced within 120 days of his arrival there. Article IV(e) provides that, once the receiving state obtains custody of the prisoner, it must try him prior to returning him to his "original place of imprisonment."

*United States v. Roy,* 771 F.2d 54, 55 (2d Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1520, 89 L.Ed.2d 918 (1986).

### 1. Speedy Trial Claim

#### a.

We begin by ascertaining the period during which the provisions of the IAD were applicable to Mr. Roy. As the Second Circuit noted, "[t]he cases holding that a pretrial detainee is not 'serving a term of

imprisonment' within the meaning of the Agreement have reasoned that such detainee lacks a sufficient interest in the rehabilitation programs of the confining jurisdiction to justify invocation of the Agreement." *Roy*, 771 F.2d at 58 (citation omitted). Therefore, the IAD became applicable to this case on January 27, 1983, when Mr. Roy's parole was revoked by the State of Connecticut and he became a prisoner serving a state sentence. On February 16, 1984, Mr. Roy's Connecticut sentence expired, and thus the IAD no longer applied.[3] *See United States v. Black*, 609 F.2d 1330, 1333 (9th Cir.1979), *cert. denied*, 449 U.S. 847, 101 S.Ct. 132, 66 L.Ed.2d 56 (1980). Mr. Roy claims that his earliest request for "speedy trial on 'all detainers' pending against him" was made on March 24, 1983.[4] Assuming, for purposes of this appeal, that Mr. Roy's first notice was on March 24, 1983, the relevant period of time, for purposes of the IAD, lasted from March 24, 1983 through February 16, 1984, a period of approximately 329 days.

### b.

We now examine the positions of the parties. The IAD, art. III(a) requires a prisoner subject to its provisions to be brought to trial within 180 days of when he has "caused" the appropriate officials to have notice of his speedy trial request.[5] Mr. Roy argues that the government violated article III(a) of the IAD,[6] and therefore

3. Relying on *Commonwealth v. Merlo*, 242 Pa. Super. 517, 364 A.2d 391, 395 (1976), Mr. Roy argues that the IAD continued to apply to him after the expiration of his state sentence because the federal detainer filed against him was still on file. First, we note that article III of the IAD provides: "[W]henever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever *during the continuance of the term of imprisonment....*" 18 U.S.C. App. III § 2, art. III(a) (emphasis supplied). Thus, by the clear language of the statute, because Mr. Roy's relevant term of imprisonment expired as of February 16, 1984, any subsequent period could not have been *during the term of his state imprisonment.*

Second, *Merlo* dealt with the anti-shuttling provision of article IV(e), rather than the speedy trial provisions of article III. In *Merlo*, the prisoner was serving a brief sentence for violating his parole. The State of Pennsylvania brought Mr. Merlo to Pennsylvania from federal custody in Connecticut to try him on one of several charges that were the subject of several detainers filed against Mr. Merlo. However, after trying Mr. Merlo on only one of the charges, it decided to return him to federal custody to serve the remainder of his federal sentence, and to try him on the other outstanding charges after his release from federal custody. As noted by other courts, both the anti-shuttling and speedy trial provisions of the IAD *must be given effect.* Thus, regardless of the speedy trial provision, it was improper for the state to bring the prisoner to its jurisdiction for trial on only one of several charges that were the subject of detainer then on file against defendant who was in federal custody, and then return the defendant to federal custody without having tried him on all the outstanding charges subject to detainers. In other words, the anti-shuttling provision was clearly violated, prior to the expiration of his federal imprisonment, re-

gardless of the time element provided for in the speedy trial provision.

4. The only evidence of such notice in the record is a May 5, 1983 request for speedy resolution of the detainer filed against him from the Northern District of Illinois relating to the escape charge.

5. The government argues that Mr. Roy failed to satisfy the notice requirements of the IAD. *See* Appellee's Br. at 15 n. 3. However, the resolution of this question is unnecessary given our disposition of this appeal.

6. Article III(a) provides:

Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint: *Provided,* That, for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of

his indictment on the escape charge should have been dismissed.

Relying on *Bush v. Muncy*, 659 F.2d 402, 408–09 n. 4 (4th Cir.1981), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1259, 71 L.Ed.2d 449 (1982), and *Young v. Mabry*, 596 F.2d 339, 343–44 (8th Cir.), *cert. denied*, 444 U.S. 853, 100 S.Ct. 107, 62 L.Ed.2d 69 (1979), the government argues that, under article VI(a),[7] the running of the 180–day period provided in article III(a) was tolled during the time the prisoner was before courts in California and Florida, as well as the time he was before the federal district court in Connecticut.[8] The government argues that during these times, the defendant was "unable to stand trial."

Mr. Roy counters that, before tolling can occur under article VI(a), the procedures of article III(a), i.e., a continuance granted for good cause shown in open court with the defendant or defendant's counsel being present, must be met. In making this argument, Mr. Roy relies upon *Stroble v. Anderson*, 587 F.2d 830 (6th Cir.1978), *cert. denied*, 440 U.S. 940, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979), *State v. McGann*, 126 N.H. 316, 493 A.2d 452, 456 (1985), and *Nelms v. State*, 532 S.W.2d 923 (Tenn. 1976).

### c.

■ In construing a statute or similar legislative work product, we must construe it to effectuate the overall legislative intent. Moreover, we must construe a legislative enactment in such a manner as to give effect to all of its provisions. In accomplishing this task, we presume that the legislature intended that each section was a necessary component of the statutory scheme and not surplusage. *Indianapolis Power & Light Co. v. ICC*, 687 F.2d 1098, 1101 (7th Cir.1982).

■ When we read the IAD according to this methodology, we cannot accept Mr. Roy's interpretation of the IAD for several reasons. First, if tolling under article VI required that the procedures set forth in article III be followed, there would be no reason to have two separate provisions. Article III already provides (as does article IV) for the granting of continuances. Unless article VI performs a distinct function, it is mere surplusage. Second, that distinct function is quite apparent from the structure of the IAD. The continuance provisions of article III and article IV are designed to permit the courts of the receiving state to postpone trial when the interests of justice make such a continuance "necessary or reasonable." The "good cause" must be shown in open court in order to ensure that the delay does not work to the detriment of the substantial rights of the prisoner. On the other hand, the continuance clause of article VI is designed to perform another function. It exempts from the governance of the IAD time when the prisoner is "unable to stand trial." It is easy to conceive of a situation where "good cause" could be shown for a necessary or reasonable continuance at the request of the government as well as the defendant even though the petitioner would be able to stand trial at that time. It is in such an instance that the requirement that the continuance be granted in open court would serve the purpose of preventing abuse of this situation by the government.

We do not read the Sixth Circuit's decision in *Stroble*, 587 F.2d 830, as necessarily

---

parole eligibility of the prisoner, and any decision of the State parole agency relating to the prisoner.
18 U.S.C. App. III § 2, art. III(a).

**7.** Article VI(a) provides:
In determining the duration and expiration dates of the time periods provided in articles III and IV of this agreement, the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter.
18 U.S.C. App. III § 2, art. VI(a).

**8.** During the period in question, Mr. Roy was in California for approximately 50 days for a trial on state charges, and in Florida for about 114 days for a trial on federal charges. Thus, Mr. Roy was out of the "sending state" for approximately 164 of the 329 days here in question. As a result, Mr. Roy was in the "sending state" for a period of approximately 165 days during the relevant period. Moreover, during this entire period, Mr. Roy was being prosecuted in the district of Connecticut.

requiring a different result, *Stroble* could be read to support Mr. Roy's argument that in order for the running of the 180–day time limit prescribed by article III to be tolled under article VI that a continuance, as provided in article III(a), must be granted. However, *Stroble* can also be read to treat the tolling under article VI as a separate question from a continuance under article III or IV. *See id.* at 838–39. Although the court discussed these two arguments consecutively, nowhere does the court state that the requirements of article IV must be met in order to provide for tolling under article VI.[9]

In any event, we find *Young v. Mabry,* 596 F.2d 339, to be a preferable approach to the present case. In that case, the court held that during the time that the petitioner, then a federal prisoner in Georgia, was in Arkansas to stand trial on federal charges, he was "unable to stand trial" on state charges in Arkansas. The Eighth Circuit there relied on article VI(a). As the court of appeals noted in affirming the holding of the district court, "it is not by any means clear that from a practical standpoint petitioner would have been either legally or administratively available for trial in the state court during the period in question." *Id.* at 343.[10] Indeed, here we have more reason to apply article VI's provisions because the defendant was not within the jurisdiction of the district court during those times for which the running of the time period was held to be tolled.

### 2. Anti-shuttling Claim

Mr. Roy next argues that his indictment should have been dismissed because the anti-shuttling provisions of article IV of the IAD were violated. Article IV(e) provides that, if a prisoner is removed to another jurisdiction to face charges, any charges not disposed of in the receiving jurisdiction prior to the prisoner's return to the sending jurisdiction shall be dismissed with prejudice. Mr. Roy argues that his overnight stay in federal custody on April 4, 1983 necessitated trial of all federal charges pending against him prior to his return to state custody. Because no trial was had on his escape charge, he argues that the indictment should have been dismissed. Mr. Roy argues that any transfer between states triggers the anti-shuttling provision.[11] Mr. Roy argues that this court should follow *United States v. Schrum,* 504 F.Supp. 23, 25–28 (D.Kan.1980), *aff'd,* 638 F.2d 214 (10th Cir.1981), and *United States v. Sorrell,* 413 F.Supp. 138, 141–42 (E.D.Pa.1976), *aff'd,* 562 F.2d 227 (3d Cir. 1977) (en banc), *cert. denied,* 436 U.S. 949, 98 S.Ct. 2858, 56 L.Ed.2d 793 (1978).

The Second Circuit faced this same claim when it decided Mr. Roy's appeal from his Connecticut federal conviction.[12] In deny-

**9.** Although Mr. Roy cites both *State v. McGann,* 126 N.H. 316, 493 A.2d 452 (1985), and *Nelms v. State,* 532 S.W.2d 923 (Tenn.1976), as supporting his position, we have not found this to be accurate. In fact, *McGann* states: "Where the defendant asserts his rights to be present at one trial, the defendant will be unable to stand trial at the same time on other charges, and the 180–day limit is tolled as to the second trial." *McGann,* 493 A.2d at 456. While the court noted that two trials may otherwise be conducted simultaneously, such is not the case where, as here, the defendant chooses to represent himself as he did in the bank robbery trial in the Middle District of Florida.

**10.** In *Young v. Mabry,* 596 F.2d 339 (8th Cir.), *cert. denied,* 444 U.S. 853, 100 S.Ct. 1071, 62 L.Ed.2d 69 (1979), the appellant, a federal prisoner in Atlanta, Georgia, made a speedy trial demand on Arkansas state authorities. However, he was not tried on the charges within the required 180 days. At issue was whether a 33–day period, during which the appellant was tried on federal charges in the Eastern District of Arkansas, should be excluded from the 180–day period prescribed by article III(a).

**11.** The parties raise the issue of whether the United States is one state for purposes of the IAD. The government argues that each district should be considered a separate state for IAD purposes while Mr. Roy argues that the United States constitutes one state for IAD purposes. Because of our disposition of Mr. Roy's claim, we need not reach this question.

**12.** The government argues that this court should apply collateral estoppel to bar Mr. Roy from relitigating this claim. While the precise parameters for the use of collateral estoppel in criminal cases have not been definitively established, we believe that a good argument can be made that this instance presents an appropriate occasion to invoke it. Mr. Roy had a full and fair opportunity to litigate this precise question in the proceedings before the Second Circuit,

ing Mr. Roy's claim, the Second Circuit relied upon *United States v. Chico,* 558 F.2d 1047 (2d Cir.1977), *cert. denied,* 436 U.S. 947, 98 S.Ct. 2850, 56 L.Ed.2d 788 (1978). In *Chico,* a prisoner was removed from a state prison for a few hours to be arraigned, plead, and be sentenced in a federal court. The prisoner was returned to the state prison that day. In this case, Mr. Roy was taken from state custody on April 4, 1983 to attend a hearing on his motion to suppress evidence in the United States District Court in Bridgeport, Connecticut. However, because federal marshals "believed that it would be imprudent to undertake after dark the three hour journey from Bridgeport to Somers [and because they] were also concerned that, if Roy was returned to Somers at night, he would be deprived of an evening meal," Mr. Roy was kept as a holdover in the Bridgeport jail and returned to Somers at 12:30 p.m. on April 5.

The court in *Roy* noted that the *Chico* holding rested on two factors: "The prisoners there 'were never imprisoned by the federal government,' ... and the purposes of the Agreement were 'fully satisfied' by their treatment." *Roy,* 771 F.2d at 60 (quoting *Chico,* 558 F.2d at 1049). The court noted that there was no significant distinction between the imprisonment suffered by the prisoners in *Chico*—being held in the lockup, and the imprisonment experienced by Mr. Roy—being confined as a holdover prisoner for several hours overnight. Regardless of this, the *Roy* court emphasized that the second *Chico* factor was the more important of the two. The court found that the interruption of Mr. Roy's state custody in no way detracted from his rehabilitation. Furthermore, it

noted that both of the reasons offered by the marshals for holding Mr. Roy at Bridgeport rather than returning him to Somers (the chance of escape and concern for Mr. Roy's evening meal) were "valid reasons." *Id.* Thus, the court held that there was no real interruption of Mr. Roy's state incarceration and that he was not deprived of any privilege at the state institution as a result of his overnight stay. *Id.*

We believe the result reached by the Second Circuit was the correct one and, on the facts of this case, is a commonsense result. The IAD was meant to protect the prisoner against endless interruption of the rehabilitation programs because of criminal proceedings in other jurisdictions. It was not meant to require the transport of a prisoner with an escape record on a three-hour nighttime journey over the New England countryside. Nor was the IAD meant to require that a prisoner be deprived of his evening meal.

In reaching this result on these facts, we caution explicitly against reading our opinion too broadly. This case and *Chico* involve a "one-day interruption of state prison confinement," *Roy,* 771 F.2d at 60, which quite obviously "posed no threat to a prisoner's rehabilitation sufficient to constitute a violation of the Agreement." *Id.* We do not mean to signal toleration for longer interruptions in state confinement or for repetitive interruptions even of short duration. The Congress and the legislatures of the several states have determined, by their acquiescence to the Agreement, that such activity is counterproductive to the goals of the penal systems of those jurisdictions. That is not a judgment that federal judges should second-guess.[13]

and the matter was decided adversely to him. Moreover, as a collateral matter, it does not implicate the right to trial by jury. However, because the government did not argue this ground in the district court, and because it treats the matter only in perfunctory fashion here, we believe it prudent not to resolve the issue definitively. *See Crowder v. Lash,* 687 F.2d 996, 1008 (7th Cir.1982) ("As an affirmative defense under Fed.R.Civ.P. 8(c), res judicata must be properly raised or it is waived.") (citations omitted); *see also Savings & Profit Sharing Fund of Sears Employees v. Gago,* 717 F.2d 1038,

1039 n. 3 (7th Cir.1983) (noting disagreement regarding whether res judicata argument may be waived and declining to raise issue *sua sponte*).

13. While we agree with the result reached by the Second Circuit and with its essential reasoning, we should not be understood as necessarily agreeing with the dicta in the last full paragraph of its opinion. It is for Congress and the state legislatures—not the federal courts—to determine whether frequent trips from a state prison to the court of another jurisdiction is more

### 3. Conclusion with Respect to the IAD

Because Mr. Roy was unable to stand trial while he was being tried in California and Florida on other charges, the running of the 180–day period provided in article III(a) was tolled such that Mr. Roy was in fact brought to trial within 180 days of his request for speedy resolution of the detainer filed against him by the United States Attorney for the Northern District of Illinois. Moreover, because we agree with the Second Circuit that there was no real interruption of Mr. Roy's state imprisonment resulting from his overnight stay in Bridgeport, we find that there was no violation of the anti-shuttling provisions of article IV of the IAD.

### B. *Mr. Roy's Pro Se Claims*

#### 1. Insanity Claim

Mr. Roy first contends that the court erroneously instructed the jury with respect to his insanity defense. Mr. Roy escaped from custody in 1982. At that time, this court applied the American Law Institute's (ALI's) definition of insanity. *See United States v. Davis*, 772 F.2d 1339, 1343 (7th Cir.), *cert. denied*, 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985). Under the ALI Model Penal Code, there was "a 'volitional prong,' under which a defendant is not responsible for his criminal conduct 'if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity ... to conform his conduct to the requirements of the law.'" *Id.* (quoting Model Penal Code § 4.01(1)). The Model Penal Code test also had a "cognitive prong: the ability 'to appreciate the nature and quality or wrongfulness of [one's] acts.'" *United States v. Hillsberg*, 812 F.2d 328, 332 (7th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987). Under this test, the defendant was presumed sane until he presented "some evidence" of insanity. *Davis*, 772 F.2d at 1343.

In 1984, Congress changed the insanity defense. 18 U.S.C. § 17 [14] provides:

(a) Affirmative defense.—It is an affirmative defense to a prosecution under any Federal statute that, at the time of commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality of the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

(b) Burden of Proof.—The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

 Thus, the new insanity defense no longer contains the "volitional prong" of the Model Penal Code. Moreover, section 17(b) makes insanity an affirmative defense that the defendant must prove by clear and convincing evidence. *See Davis*, 772 F.2d at 1343 n. 2 (noting other changes not relevant here). Several courts have held that the application of the new insanity defense to a case involving a crime committed before the effective date of the new statute violates the ex post facto clause of the Constitution. *See United States v. Samuels*, 801 F.2d 1052, 1054 n. 1 (8th Cir.1986); *United States v. Prickett*, 604 F.Supp. 407, 410–11 (S.D. Ohio 1985); *United States v. Kowal*, 596 F.Supp. 375, 377 (D.Conn.1984). This court, while noting the potential ex post facto problem, has not taken a position on that issue. *United States v. Teller*, 762 F.2d 569, 576 n. 4 (7th Cir.1985). Although Mr. Roy pointed out this potential ex post facto problem in his "requested jury instructions," R.111–12 at 3–4 n. *, the court, without discussion, applied 18 U.S.C. § 17.

 During the post-trial motions, the trial judge opined that any error in his instruction on insanity was harmless because Mr. Roy had presented insufficient

---

preferable than "incarceration for several weeks or months in local jails...." *Roy*, 771 F.2d at 60. All we need hold here is that a one day trip to a federal court that turns out to involve an overnight stay because of logistical problems

poses no threat to the policies underlying article IV(e).

**14.** 18 U.S.C. § 17 was formerly numbered 18 U.S.C. § 20.

evidence to even merit an insanity instruction. We believe that the district judge was correct in that estimation.

To support his defense of insanity Mr. Roy sought to establish: 1) that he had been raped as a young boy; 2) that this experience left him with an uncontrollable fear of being raped again; 3) that another prisoner at the MCC was threatening him sexually at the time of his escape; and 4) that, because of combination of the above factors, he was unable to remain in custody. The testimony of the witnesses can hardly be said to support the defense of insanity. Mr. Roy's mother testified about an emotionally traumatic experience for Mr. Roy as a young boy. However, she had no personal knowledge of his state of mind at the time of or near the time of his escape. The other witness, Mr. Roy's fellow prisoner, had personal knowledge of Mr. Roy's activity immediately prior to his escape. However, he gave no testimony to support Mr. Roy's claims of insanity. Mr. Roy's third witness was one of the lawyers, Mr. Kling, who had represented him during an earlier period in the case. Mr. Kling simply testified that he had notice of Mr. Roy's intention to use an insanity defense and of his desire to hire an investigator to help locate witnesses to establish that defense. Based upon this evidence, we agree with the district court that there was no evidence before the jury to support Mr. Roy's insanity defense. *See* R.121 at 3–4 (order denying motion for arrest of judgment); *see also United States v. Alden,* 767 F.2d 314, 320 (7th Cir.1984) (insanity instruction should not be given when there is no credible evidence to support insanity defense); *United States v. Gorman,* 393 F.2d 209, 211 (7th Cir.) (same), *cert. denied,* 393 U.S. 832, 89 S.Ct. 102, 21 L.Ed.2d 103 (1968).

### 2. Acquittal on Bank Robbery Charge

■ Mr. Roy next argues that the court erred by refusing to instruct the jury that it could consider his acquittal of the bank robbery charge for which he was held at the time of his escape. As the government notes, however, acquittal on the charges for which the defendant was held in custody at the time of the escape is not a defense to the escape charge under 18 U.S.C. § 751(a). *See United States v. Cluck,* 542 F.2d 728, 732 (8th Cir.), *cert. denied,* 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 597 (1976); *United States v. Smith,* 534 F.2d 74, 75 (5th Cir.1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977).

Mr. Roy also argues that the district court erred by refusing to instruct the jury that the government was required to show, as an element of his escape charge, that he was lawfully arrested based upon probable cause. Section 751(a) provides, in pertinent part:

Whoever escapes or attempts to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General, or from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or commissioner, or from the custody of an officer or employee of the United States pursuant to *lawful arrest,* shall, if the custody or confinement is by virtue of an arrest on a charge of felony. . . .

18 U.S.C. § 751(a) (emphasis supplied).

■ Mr. Roy focuses on the "lawful arrest" language, arguing that this phrase modifies the various types of custody described in the statute. However, that language modifies only the phrase "custody of an officer or employee of the United States." Mr. Roy was charged in an indictment with escape from the MCC. He was held in custody "by virtue of process issued under the laws of the United States," 18 U.S.C. § 751, i.e., a commitment order issued by a United States Magistrate. As noted by the court in *United States v. Allen,* 432 F.2d 939 (10th Cir.1970):

Under these circumstances [pursuant to an order of a United States Commissioner] a lawful arrest is not a prerequisite to the crime of escape mandated by section 751(a), since the section is to be read in the disjunctive, not conjunctive, and neither the regularity of his arrest nor the propriety of his confinement can be tested by an act of escape.

*Id.* at 940 (citations omitted); *see also Cluck,* 542 F.2d at 732.

### 3. Constitutionality of 18 U.S.C. § 751(a)

 Mr. Roy next argues that section 751(a) is unconstitutional because it provides for a more severe maximum penalty for escape by a prisoner charged with a felony than for an escape by a prisoner charged with a misdemeanor, regardless of whether the prisoner is eventually acquitted. He argues that the statute is arbitrary, that it provides a conclusive presumption, that it raises an illegal inference of guilt upon accusation, that it violates due process and equal protection guarantees, and that it destroys the presumption of innocence to which he is entitled.

We find no merit to Mr. Roy's arguments that section 751(a) is unconstitutional. The distinction made by the statute between escapees charged with felonies and escapees charged with misdemeanors is by no means an arbitrary classification. The classification is rationally related to a legitimate governmental interest. Regardless of whether the prisoner is eventually convicted of the crime for which he is charged, society has an interest in penalizing an escape by one charged with a more serious crime more severely than an escape by one charged with a minor crime. Moreover, society has a greater interest in making sure that the guilt or innocence of one charged with a serious offense is determined through the judicial process. Other statutes make similar distinctions. For example, the Bail Reform Act, 18 U.S.C. § 3146, authorizes a more severe punishment for one who fails to appear depending on the seriousness of the crime charged, regardless of whether that person is eventually acquitted of the charges. Furthermore, the seriousness of the offense charged is often a consideration in the setting of bond. Finally, because the statute provides only maximum penalties, a given escapee's sentence may vary depending upon other factors that mitigate or aggravate his offense.

### 4. Investigator and Subpoenas

 Mr. Roy next argues that the district court erred by refusing to provide Mr. Roy certain subpoenas and an investigator. A review of the record shows that the court entertained Mr. Roy's requests and refused them only as to documents and witnesses that were not relevant to the case. *See* R.135 at 6–39. Originally, Mr. Roy was given the opportunity to obtain the services of an investigator for the purpose of finding potential witnesses. *See* R.133 at 303–04. However, because of Mr. Roy's failure to cooperate with appointed counsel and apparently with prison authorities, he was unable to obtain the services of an investigator.[15] *Id.* Given this fact, we cannot say that Mr. Roy was wrongly denied the services of an investigator. Nor can we say that the district court erroneously denied Mr. Roy's request for subpoenas. Mr. Roy is not able to show that any challenged ruling of the district court was related to legally relevant evidence.

### 5. Access to Legal Materials

 Mr. Roy also argues that, while at the MCC, he was denied the opportunity to prepare an adequate defense. He claims that he was denied access to legal materials, to the advice of other inmates, and to a telephone. As the government argues, and this court observed from the record, there is no evidence of Mr. Roy's being denied access to legal materials. The record shows that Mr. Roy filed an "extensive array of pre-trial motions." Appellee's Br. at 30. Moreover, Mr. Roy has filed briefs raising pro se challenges to his conviction below. The briefs show both a familiarity with legal research and writing and the pertinent law. However, regardless of Mr. Roy's filings, the district court appointed three different attorneys to represent Mr. Roy. In fact, the district court asked one of these attorneys to remain as standby counsel for Mr. Roy at his trial, even after

---

**15.** As Mr. Roy's standby counsel informed the district court, the investigators were unwilling to work directly with a criminal defendant. Instead, they preferred to work through the defendant's attorney. R. 133 at 303–04. However, Mr. Roy declined the services of an attorney after having problems with three separate attorneys.

Mr. Roy had clearly expressed his preference to defend himself. The record shows that Mr. Roy had an opportunity to consult with standby counsel as often as he liked. Given these factors, we find no merit to Mr. Roy's arguments that he was denied the opportunity to adequately develop his defense.

### 6. Effective Assistance of Counsel

■ Mr. Roy's final claim is that he was denied the effective assistance of counsel. The basis of this claim is that his third appointed counsel petitioned the district court to order a psychiatric evaluation of Mr. Roy regarding his mental condition both at the time of the crime and at the time of trial. Mr. Roy argues that this amounted to ineffective assistance of counsel because the IAD would not apply if he were found mentally incompetent.

■ This claim can hardly meet the requirements of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, given the fact that Mr. Roy sought to raise an insanity defense, it cannot be said that his counsel's decision to seek an order for psychiatric evaluation fell below the objective standard of reasonableness. *Id.* at 687–91. Likewise, counsel's alleged failure to pursue this defense after two psychiatrists found Mr. Roy to be mentally capable and competent to stand trial was also a reasonable decision. Thus, by failing to meet the first prong of the *Strickland* test, Mr. Roy's claim of ineffective assistance of counsel fails. Moreover, even if it were necessary to consider the prejudice prong, Mr. Roy cannot make the required showing that, absent these alleged errors of counsel, the result of the proceeding would have been different. *United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1013 (7th Cir.1987).

### Conclusion

Because we find no merit to any of Mr. Roy's various claims of error, we affirm the judgment of the district court.

AFFIRMED